Dorothy GOOSBY, Samuel Prioleau,
Xavier Morales, and Miladys
Morales, Plaintiffs,

v.

TOWN BOARD OF the TOWN OF HEMP-
STEAD, NEW YORK, Gregory P. Peter-
son, Richard A. Zagarino, Curtis Fisher,
Joseph Ra, Anthony Santino, Joseph
Kearney, in their official capacities as
members of the Town Board of the
Town of Hempstead, Nassau County
Board of Elections, John DeGrace and
Steven Sabbeth, in their official capaci-
ties as Commissioners of Elections of
Nassau County, Defendants.

No. 88–CV–2453 (JG).

United States District Court,
E.D. New York.

Oct. 20, 1997.

Frederick K. Brewington, Hempstead, NY, and Randolph M. Scott–McLaughlin, Center for Constitutional Rights, New York, NY, for Plaintiffs.

Leonard B. Austin, Huntington Station, NY, for Defendant Steven Sabbeth.

Joseph J. Ortego, Evan H. Krinick, Kenneth A. Novikoff, Rivkin, Radler & Kremer, Uniondale, NY, for Defendant, Town Board of Town of Hempstead.

John E. Ryan, Floral Park, NY, for Defendant John DeGrace.

### MEMORANDUM, ORDER AND PERMANENT INJUNCTION

GLEESON, District Judge.

Plaintiffs brought this action against the Town Board of the Town of Hempstead ("the Town Board") and other defendants alleging violations of Section 2 of the Voting Rights Act of 1965 and the United States Constitution. On February 20, 1997, I concluded that the at-large system used for electing members of the Town Board operates to invidiously exclude black voters from effective participation in political life in the Town of Hempstead ("the Town"), in violation of Section 2. I ordered the Town Board to submit a remedial plan that divides the Town into six single-member voting districts. *See Goosby v. Town Board of the Town of Hempstead*, 956 F.Supp. 326, 356 (E.D.N.Y.1997).

On May 16, 1997, the Town Board submitted two proposals. The first, which it urges me to adopt, is a highly unusual two-district plan. One of the two districts is a single-member majority-minority district that is identical to the majority-minority district proposed by plaintiffs at trial. However, under the Town Board's two-district plan, the rest of the Town is a single, multi-member district for the election of the remaining five members of the Town Board. A rough map of the two-district plan is appended to this decision at A–1.

The second proposed plan, which the Town advances only in the event I reject the first, is a six-district plan that is substantially similar to the plan proposed by plaintiffs at trial. A rough map of the plan is appended at A–2; a precise description of the plan by Census tract and block follows at A–3 through A–10.

Plaintiffs oppose the two-district plan, contending that it violates the Fourteenth and Fifteenth Amendments to the United States Constitution and Section 2 of the Voting Rights Act of 1965. They have no objection to the six-district plan proposed in the alternative.

For the reasons set forth below, I conclude that the two-district plan proposed by the Town Board is unconstitutional, and thus may not be implemented to remedy the Section 2 violation. The Town Board's alternative proposal—the six-district plan—is constitutional, and I hereby order that it be implemented. The implementation of this remedial plan is stayed pending appeal.

Plaintiffs recently filed motion to enjoin the upcoming election is denied.

## DISCUSSION

 Redistricting is a legislative task that federal courts "should make every effort not to pre-empt." *Wise v. Lipscomb,* 437 U.S. 535, 539, 98 S.Ct. 2493, 2497, 57 L.Ed.2d 411 (1978). Where a court has struck down a voting system, it must give the appropriate elected body an opportunity to propose a remedial plan. *See id.* at 540, 98 S.Ct. at 2497. If it submits such a plan, the court must accord the proposal substantial deference. It does not matter whether the court considers the proposal the "best" plan, and it may not reject the plan to adopt what it considers to be a better one. Rather, the court's role is only to consider whether the plan proposed by the elected body is legally acceptable, *i.e.,* whether it comports with the requirements of the Voting Rights Act and the Constitution. *See Upham v. Seamon,* 456 U.S. 37, 42–43, 102 S.Ct. 1518, 1521–22, 71 L.Ed.2d 725 (1982).

### A. *The Scope of Review*

 The first step in assessing a proposed Section 2 remedy is determining whether it is legislative or judicial. This categorization affects the scope of review. For example, a judicially crafted remedy may not employ multi-member districts " 'absent insurmountable difficulties' " in using single-member districts. *Chapman v. Meier,* 420 U.S. 1, 18, 95 S.Ct. 751, 761–62, 42 L.Ed.2d 766 (1975) (quoting *Connor v. Johnson,* 402 U.S. 690, 692, 91 S.Ct. 1760, 1762, 29 L.Ed.2d 268 (1971)); *see McDaniel v. Sanchez,* 452 U.S. 130, 139, 101 S.Ct. 2224, 2230–31, 68 L.Ed.2d 724 (1981). Also, since " 'reapportionment is primarily the duty and responsibility of the State,' " the Supreme Court has tolerated "greater flexibility" in applying the one-person, one-vote requirement to legisla-

tively crafted plans. *Id.* at 139, 101 S.Ct. at 2230–31 (quoting *Chapman,* 420 U.S. at 27, 95 S.Ct. at 766). A court-crafted plan, on the other hand, " 'must ordinarily achieve the goal of population equality, with little more than *de minimis* variation.' " *Id.* (quoting *Chapman,* 420 U.S. at 26–27, 95 S.Ct. at 765–66).[1]

 The key factor in determining whether a proposed remedy is legislative or judicial is whether the proposal reflects "the policy choices of the elected representatives of the people." *McDaniel,* 452 U.S. at 153, 101 S.Ct. at 2238. The legislative body's legal authority to enact a reapportionment plan is not dispositive. *See id.* at 152, 101 S.Ct. at 2237–38. Rather, "the essential characteristic of a legislative plan is the exercise of legislative judgment." *Id.* "The fact that a reapportionment plan was crafted in response to an order of a federal court does not *change* its essential character as a legislative plan." *Id.* at 146, 101 S.Ct. at 2234.

 Although proposed in compliance with an order of this Court, the plans proposed by the Town Board clearly reflect the policy choices of its members. The Town Board employed an expert, Dr. Harold W. Stanley, to devise its proposals. The six-district back-up plan draws on the proposal made by plaintiffs at trial, but does not adopt it wholesale. In developing its plans, the members of the Town Board, acting as elected representatives of the people of the Town,[2] placed their imprimatur on the plans. I conclude that the plans reflect policy choices made by the Town Board and as such must be considered legislative plans.

### B. *The Constitutionality of the Plans*

A reapportionment plan adopted in order to remedy a violation of Section 2 of the Voting Rights Act must be constitutional. In reviewing the plans proposed by the Town

---

1. Legislative plans are also distinct from judicial plans in that legislative plans submitted from jurisdictions covered by Section 5 of the Voting Rights Act must be pre-cleared in accordance with Section 5. *See* 42 U.S.C. § 1973c. However, since the Town of Hempstead is not a covered jurisdiction, *see* 28 C.F.R. pt. 51 app., Section 5 is not implicated here.

2. In determining whether the plans are legislative or judicial, I place no significance on the fact that the Town Board prefers the two-district plan over the six-district plan. The fact that the six-district plan is offered only in the alternative; *i.e.,* in the event I reject the two-district plan, does not alter the fact that it was crafted entirely by a legislative body, reflecting its policy choices.

Board, two constitutional requirements are relevant: the one-person, one-vote requirement and the prohibition on improper use of race in districting.

### 1. *One–Person, One–Vote*

 The Equal Protection Clause requires that apportionment be based on the general principle of population equality, *i.e.,* "one-person, one-vote." *Reynolds v. Sims,* 377 U.S. 533, 568, 84 S.Ct. 1362, 1384–85, 12 L.Ed.2d 506 (1964). This principle applies to apportionment for local elections as well as state and federal elections. *See Abate v. Mundt,* 403 U.S. 182, 185, 91 S.Ct. 1904, 1906–07, 29 L.Ed.2d 399 (1971). In some circumstances, precise equality of population is required. *See Karcher v. Daggett,* 462 U.S. 725, 744, 103 S.Ct. 2653, 2665–67, 77 L.Ed.2d 133 (1983) (congressional districting plans that are not "functionally equal" in population violate Equal Protection Clause; districts varied 0.6984% in population). However, plans for the election of state legislators are accorded greater flexibility in the application of the one-person, one-vote rule. The Supreme Court has held that such apportionment plans generally satisfy the one-person, one-vote requirement if they have a maximum population deviation among districts of less than 10%. *See Brown v. Thomson,* 462 U.S. 835, 842, 103 S.Ct. 2690, 2695–96, 77 L.Ed.2d 214 (1983); *see also White v. Regester,* 412 U.S. 755, 764, 93 S.Ct. 2332, 2338–39, 37 L.Ed.2d 314 (1973). The Court also has recognized that "slightly greater percentage deviations may be tolerable for local government apportionment schemes." *Abate,* 403 U.S. at 185, 91 S.Ct. at 1907 (approving population deviation of 11.9% for local government in Rockland County, New York).

 The Town of Hempstead has a total population of 725,639. The ideal district population for a six-district plan would be 120,939. The total population in District 1, the proposed majority-minority district, would be 117,884, a deviation of 2.53% from the ideal. The total population of the proposed multi-member district 2 would be 607,755, which would deviate from the ideal by .51%. Given the "greater flexibility" accorded state and local governments, *McDaniel,* 452 U.S. at 138, 101 S.Ct. at 2230, I conclude that these deviations from the ideal population are constitutional.

 The Town Board's six-district plan also satisfies the one-person, one-vote requirement. District 5 is the smallest district, with a population of 117,751; District 4 is the largest district, with a population of 124,754. The total population deviation is therefore 7,003—a total deviation of 5.79% from the ideal district size. This population deviation is well within the limits established by the Supreme Court.

### 2. *"Wrongful Districting"*

In *Shaw v. Reno,* 509 U.S. 630, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993) (*"Shaw I"*), the Supreme Court recognized a new cause of action, under the Equal Protection Clause of the Fourteenth Amendment, that places limits on the use of race in districting. Specifically, "a plaintiff challenging a reapportionment statute under the Equal Protection Clause may state a claim by alleging that the legislation, though race-neutral on its face, rationally cannot be understood as anything other than an effort to separate voters into different districts on the basis of race, and that the separation lacks sufficient justification." *Id.* at 649, 113 S.Ct. at 2828. This cause of action has been referred to as "wrongful districting" *See* Pamela S. Karlan, "Still Hazy After All These Years: Voting Rights In The Post–Shaw Era," 26 *Cumb. L.Rev.* 287, 290 (1996).

In recognition of the fact that districting is virtually always race-conscious, a plurality of the Supreme Court has observed that the "strict scrutiny" envisioned by *Shaw I* does not apply to all districting schemes in which race is a factor, even if they result in the intentional creation of majority-minority districts. Rather, for strict scrutiny to apply, plaintiffs must show that "race was the predominant factor motivating the legislature's decision," that is, "that the legislature subordinated traditional race-neutral districting principles, including but not limited to compactness, contiguity, respect for political subdivisions or communities defined by actual shared interests, to racial considerations."

*Miller v. Johnson,* 515 U.S. 900, 916, 115 S.Ct. 2475, 2488, 132 L.Ed.2d 762 (1995); *see Bush v. Vera,* 517 U.S. 952, ——, 116 S.Ct. 1941, 1954, 135 L.Ed.2d 248 (1996); *Shaw v. Hunt,* 517 U.S. 899, ——, 116 S.Ct. 1894, 1902, 135 L.Ed.2d 207 (1996) ("*Shaw II*"). If a challenge to a districting plan meets this threshold burden of proving that race was the predominant factor motivating the legislature, strict scrutiny applies; unless the challenged features of the plan are narrowly tailored to serve a compelling state interest, the plan must be invalidated as unconstitutional. *See Bush,* 517 U.S. at ——, 116 S.Ct. at 1951.

The foregoing arguably oversimplifies the state of this new cause of action. The members of the Supreme Court are divided in several critical respects. For example, at least three justices apparently believe that strict scrutiny should be applied to all cases in which majority-minority districts are intentionally created. *See id.* at —— – ——, 116 S.Ct. at 1971–72 (Kennedy, J. concurring); *id.* at —— – ——, 116 S.Ct. at 1972–74 (Thomas, J., concurring). The Court is similarly divided over the question of whether compliance with Section 2 of the Voting Rights Act of 1965 is a compelling state interest that justifies race-conscious districting. It has assumed that to be the case without deciding the issue, *see, e.g., id.* at ——, 116 S.Ct. at 1960, but Justice O'Connor's separate concurring opinion in *Bush v. Vera,* expressing her view that such compliance is a compelling state interest, was not endorsed by the justices who joined her plurality opinion, *see id.* at —— – ——, 116 S.Ct. at 1968–70.

These are difficult issues, and the deep divisions within the Supreme Court have prevented it from providing much-needed guidance to lower courts "as they toil with the twin demands of the Fourteenth Amendment and the Voting Rights Act." *Id.* at ——, 116 S.Ct. at 1968 (O'Connor, J., concurring). I nonetheless conclude that there is no view of race-conscious districting that would fail to subject the two-district plan proposed here to

strict scrutiny. I also conclude that even if a legislature's effort to remedy an actual violation of Section 2 entitles it to greater leeway in considering race, the two-district plan must be rejected as unconstitutional.

As for the six-district alternative plan, it does not warrant strict scrutiny; even if it did, it would survive constitutional attack.

a. *The Two-District Plan*

(i) *The Nature of the Proposed Plan*

The Town Board seeks to defend its proposed two-district plan with several arguments. One is its assertion that courts, including the Supreme Court, have consistently upheld as constitutional electoral schemes "consisting of a mixture of single-member and multi-member districts." Memorandum at 8.[3] The Town Board seeks support from a number of cases in which such plans have been approved, and proclaims that the proposed two-district plan is "functionally indistinguishable from" the plan upheld by the Fourth Circuit in *Hines v. Mayor & Town Council of Ahoskie,* 998 F.2d 1266 (4th Cir. 1993). Reply Memorandum at 6. This argument is misleading. The Town Board's description of its two-district plan as a "mixed" electoral scheme akin to those in the cases it cites obscures a critical distinguishing feature of the Town's proposed plan. In fact, a more careful examination of the proposed scheme reveals that it is quite unusual.

There are three electoral formats commonly used by municipal governments in the United States: at-large systems, single-member district systems, and mixed systems. In an at-large system, all members of the legislative body are elected from a district that includes all members of the electorate. In a single-member district system, the legislators are elected from compact, contiguous and essentially equipopulous districts. In a mixed system, some members of the legislature are elected from single-member districts, while other members, usually a

---

**3.** "Memorandum" refers to the undated Memorandum Of Law In Support Of The Defendant Town Board Of The Town Of Hempstead's Proposed Remedial Plan. "Reply Memorandum" refers to the June 6, 1997 memorandum submitted in further support of the plan.

smaller number, are elected at large.[4] In a typical mixed system, the districts cover the entire municipality. Thus, each voter is represented both by one or more legislators elected from a district and one or more legislators elected at large.

As noted above, the Town Board relies on several cases involving these mixed systems.[5] *Hines*, for example, endorsed an election plan that divided the Town of Ahoskie, North Carolina into two districts, one majority-black and the other majority-white. Two Town Council members would be elected from each district by a plurality vote, and a fifth member of the Town Council would be elected at-large from the entire town population. *See Hines*, 998 F.2d at 1269; *see also Baird*, 976 F.2d at 358 (the challenged electoral plan included 25 single-member districts and four representatives elected at-large); *Tallahassee Branch of NAACP*, 827 F.2d at 1437 (five single-member districts and two at-large seats); *James*, 611 F.Supp. at 27 (three multi-member districts for election of three representatives per district and two at-large representatives). In all of those cases, all voters were treated the same in this respect: each voter would cast a vote for one or more representatives of the voter's district and one or more at-large representatives.

The two-district plan proposed here is not such a system. If adopted, the voters in the Town of Hempstead will not be treated the same. They will not receive a combination of district and at-large representation on the Town Board. To the contrary, the plan seeks to carve the Town into two groups of voters: one-sixth of the Town will have a district representative, whereas the remainder of the population will receive the quasi-at-large representation of five members who represent the other five-sixths of the Town.

Irrespective of one's view of the "much mooted" comparative merits of the single-member versus at-large approach to local representation, *Whitcomb v. Chavis*, 403 U.S. 124, 154 n. 33, 91 S.Ct. 1858, 1874 n. 33, 29 L.Ed.2d 363 (1971), there is no dispute that these approaches result in different forms of representation. The two-district plan advanced by the Town Board thus distinguishes itself from the cases cited above by providing different forms of representation to the people in the Town of Hempstead. This feature of the proposed plan makes it extremely unusual. The Town Board's suggestion that it is a typical "mixed" electoral scheme of the sort that has been consistently upheld, *see* Memorandum at 8, is thus inaccurate.

I recognize that this unusual mixture of single-member and multi-member districts is not unprecedented. For example, plaintiffs rely on *Simkins v. Gressette*, 631 F.2d 287, 290 (4th Cir.1980), in which a reapportionment plan for the South Carolina legislature included three single-member districts and thirteen multi-member districts for the election of from two to five members each. However, the court in *Simkins* emphasized that there was not the "slightest evidence" of racial motivation in the classification of the voters into the different types of districts. *Id.* at 292 (quoting *McCollum v. West*, No. 71–1211 (D.S.C. Apr. 7, 1972)). Moreover, I have found no case involving a challenge to a hybrid plan like the one proposed here, *i.e.*, one single-member district and one multi-member district. In short, the precise electoral plan advocated by the Town Board would be highly unusual, perhaps unique, in the annals of municipal electoral formats in this country. I have no doubt that, if accepted, it would be the only electoral scheme with a highly distinctive feature attributable solely to a racial classification.[6]

---

**4.** A small number of municipal governments elect multiple members of the legislature from districts. These "multi-member district systems" may, on occasion, also include at-large seats as well.

**5.** In addition to the Fourth Circuit's decision in *Hines*, the Town Board cites *Baird v. Consolidated City of Indianapolis*, 976 F.2d 357 (7th Cir. 1992), *cert. denied*, 508 U.S. 907, 113 S.Ct. 2334, 124 L.Ed.2d 246 (1993); *Tallahassee Branch of*

*NAACP v. Leon County, Florida*, 827 F.2d 1436 (11th Cir.1987), *cert. denied*, 488 U.S. 960, 109 S.Ct. 402, 102 L.Ed.2d 391 (1988); and *James v. City of Sarasota*, 611 F.Supp. 25 (M.D.Fla.1985).

**6.** The Town Board relies on a consent decree in *Jackson v. City of Salisbury, Maryland*, Civ. No. Y–86–587, slip op. at 3 (D. Md. June 23, 1987). Upon the agreement of the parties in that case, the district court ordered that city council elections occur under a plan providing for a majori-

### (ii) *The Necessity for Strict Scrutiny*

■ The sole basis for this extraordinary system—for this formal political division of the people in the Town of Hempstead—is race.[7] There has been no attempt to justify it by reference to a single traditional districting principle. Although the Town Board makes passing reference to its belief that local government "operates better when elected officials must answer to the entire electorate," and to the preference in New York State for the "at-large system" of town government, Memorandum at 17, those principles obviously played no role in the proposed system. If the Town Board has its way, no member of the Town Board would "answer to the entire electorate," and none would be elected at-large.[8]

Rather, it has proposed a system that it grudgingly admits in is reply memorandum is "atypical," Reply Memorandum at 2, based solely on racial considerations. The Town Board does not even deny plaintiff's claims that the two-district plan evokes images of apartheid, and resembles India's reserved seats for scheduled castes. Instead, it places the blame for this on plaintiffs: "If the plan smacks of apartheid, or resembles the 'set aside' seats of India, it is because District I was drawn along racial lines, at plaintiffs'

insistence, and not because there is only one other district instead of five." Reply Memorandum at 5 (citation omitted). In short, strict scrutiny must be applied to the two-district plan because race is not merely the predominant factor motivating the classification of the voters, it is the *only* factor.

### (iii) *Plaintiffs' "Standing" to Challenge the Two–District Plan*

■ The Town Board contends that once plaintiffs get their majority-minority district, the electoral plan for the rest of the Town is none of their business.[9] The Town Board does not explicitly contend that plaintiffs lack standing to challenge the two-district plan. Nor could it; as residents of the district that the Town Board seeks to isolate from "town-wide" representation on racial grounds, plaintiffs obviously have the standing to allege wrongful districting. *See United States v. Hays*, 515 U.S. 737, 744–46, 115 S.Ct. 2431, 2436, 132 L.Ed.2d 635 (1995) (plaintiffs residing in a racially gerrymandered districts "may suffer the special representational harms racial classifications can cause" and thus have standing to challenge them). However, the Town Board's argument suggests that plaintiffs, having received their remedy for the vote dilution that violated

---

ty-minority single-member district and a multi-member district for the election of the four other members. A similar hybrid system was also created by a consent decree in *NAACP v. Spartanburg County Board of Education*, No. 7: 91–3111–20, slip op. at 2 (D.S.C. Apr. 18, 1994). The hybrid plans in those cases (one of which predates *Shaw I*) were of course the product of accommodation and cooperation among black voters and local governments, and the approval of the consent orders no doubt encouraged such conduct. I express no view on the question whether the two-district plan in this case would be acceptable if it came to me by way of agreement. *See Stovall v. City of Cocoa, Florida*, 117 F.3d 1238, 1242 (11th Cir.1997) (a district court should reject a consent decree in a voting rights case if it determines the decree to be unreasonable, unfair or unconstitutional). In any event, I do not regard either of the cited cases as equivalent to a holding that the sort of relief proposed here is constitutional.

7. The segregation effected by the Town Board's two-district plan is almost total. Ninety-seven percent of the black voters in the Town of Hempstead are placed in District 1, which has an

overall population that is over 58% black. By contrast, District 2 (*i.e.,* the balance of the Town) is over 97% non-black.

8. The Town Board acknowledges that "the most common system adopted by jurisdictions that wish to retain some aspect of jurisdiction-wide representation is a combination of single-member districts and at-large seats," but asserts that "[i]n the Town, however, the small portion of the electorate that is black precludes this option." Reply Memorandum at 8. I disagree. There is no minimum percentage of black voters that is necessary for a truly mixed electoral scheme, and the percentage of black voters in the Town did not "preclude" the Town Board from proposing one.

9. *See* Reply Memorandum at 6 ("Notwithstanding the fact that plaintiffs do not like the 'look' of the two-district remedial plan, they can muster no other legally relevant objection to the plan. What plaintiffs presently avoid but must ultimately concede is that how the Town Board decides to elect the remaining five Town Board members has no effect on how blacks vote in District 1.")

Section 2, have no cognizable objection to the unusual hybrid electoral plan created to afford them that relief.

 This argument misapprehends the nature of the cause of action identified in *Shaw I*. The new, "analytically distinct" claim of wrongful districting does not require proof that plaintiffs were denied the right to vote or that their votes were diluted. *Shaw I*, 509 U.S. at 632, 113 S.Ct. at 2819; *see* Pamela S. Karlan, "Still Hazy After All These Years: Voting Rights In the Post–Shaw Era," 26 *Cumb. L.Rev.* 287, 290 (1996). The wrongful districting cause of action prohibits the excessive use of race in drawing district lines not because of any discrete harm to particular voters, but because it "injures voters in other ways. It reinforces racial stereotypes and threatens to undermine our system of representative democracy by signaling to elected officials that they represent a particular racial group rather than their constituency as a whole." *Shaw I*, 509 U.S. at 650, 113 S.Ct. at 2828. *Shaw I* thus affords relief under the Equal Protection Clause for what has been termed *"expressive* harms"—harms that result "from the ideas or attitudes expressed through a governmental action, rather than from the more tangible or material consequences the action brings about." Richard J. Pildes & Richard G. Niemi, "Expressive Harms, 'Bizarre Districts,' And Voting Rights: Evaluating Election District Appearances After *Shaw v. Reno*," 92 *Mich. L.Rev.* 483, 506–07 (1993). Therefore, even if the Town Board is correct in asserting that plaintiffs do not suffer individual, concrete harm, that does not defeat their constitutional challenge to the two-district plan.

It is difficult to conceive of a districting proposal that inflicts greater "expressive harm" than the one at issue here. The single-member district in the proposed two-district plan would of course be viewed as the seat reserved for African–Americans, while the other district would be viewed as the domain of the white voters. The separation of nearly all black citizens into one single-member district and nearly all whites into a large multi-member one "bears an uncomfortable resemblance to political apartheid." *Shaw I*, 509 U.S. at 647, 113 S.Ct. at 2827.

The plan also creates the risk of pitting the member of the Town Board from the "black district" against the five members elected from the "white district." This kind of division threatens to "balkanize us into competing racial factions" and "carry us further from the goal of a political system in which race no longer matters—a goal that the Fourteenth and Fifteenth Amendments embody, and to which the Nation continues to aspire." *Id.* at 657, 113 S.Ct. at 2832. In short, I conclude that the Town Board's two-district proposal is the type of districting plan that *Shaw I* intended to prohibit.

Moreover, I cannot conclude that plaintiffs would suffer only these "expressive" harms if the two-district plan is adopted. There is a troubling aspect of this case that is not present in other wrongful districting cases. Other wrongful districting cases generally involve challenges to districts created to benefit minorities. Over time, these challenges will help demarcate the boundaries between appropriate and inappropriate race-consciousness in districting. For now, it appears that when such districting otherwise complies with "traditional" districting principles, it is considered constitutionally appropriate to ensure evenhanded treatment; but when race has been "singled out for exceptionally preferential treatment," the districting has been transformed from nondiscrimination into impermissible affirmative action. Richard H. Pildes, "Principled Limitations on Racial and Partisan Redistricting," 106 *Yale L.J.* 2505, 2510–11 (1997).

This case is different because the challenged conduct is not the creation of the majority-minority district itself, but of the highly unusual electoral plan in which the Town Board has embedded it. It is also different because the challenged conduct was not intended to be "preferential" treatment. Indeed, it seems like an effort to punish the black communities in the Town for successfully breaching what the Town Supervisor described as the "oneness" of the "suburban mentality" in the Town. *Goosby*, 956 F.Supp. at 346. The unusual hybrid government would likely remedy the illegal vote dilution, but it would also punish the black communities by isolating them and their elected rep-

resentative. In addition to the "expressive" harm this inflicts, the trial testimony leads me to conclude that it is designed to facilitate a concrete harm as well. Specifically, the creation of the unusual multi-member district for the remainder of the Town appears designed to enhance the ability of the Town Board to act as the Town Supervisor predicted it would act if plaintiffs prevailed in this case: parochially, in ways that will permit it to do the "wrong thing" politically with respect to the newly created "zone." *Id.* at 347. In sum, even if plaintiffs' standing to challenge the two-district plan required a showing of concrete harm, I would find that such a showing has been made.

#### (iv) *The Compelling State Interest*

 To survive strict scrutiny, a redistricting plan must be narrowly tailored to meet a compelling state interest. *See Bush,* 517 U.S. at ——, 116 S.Ct. at 1960. As noted above, the Supreme Court has yet to address directly the question whether compliance with Section 2 of the Voting Rights Act is a compelling state interest sufficient to overcome strict scrutiny. *See id.* at ——, 116 S.Ct. at 1960. However, it appears that a majority of justices agree that it is. *See id.* at ——, 116 S.Ct. at 1969 (O'Connor, J., concurring); *id.* at ——, 116 S.Ct. at 1989 (Stevens, J., joined by Ginsburg and Breyer, JJ., dissenting); *id.* at ——, 116 S.Ct. at 2007 (Souter, J., joined by Ginsburg and Breyer, JJ., dissenting). Lower courts have repeatedly held that Section 2 is itself constitutional, suggesting that satisfying Section 2 would be a compelling state interest. *See id.* at ——, 116 S.Ct. at 1968 (O'Connor, J., concurring) (collecting cases). "The results test of § 2 is an important part of the apparatus chosen by Congress to effectuate this Nation's commitment 'to confront its conscience and fulfill the guarantee of the Constitution' with respect to equality in voting." *Id.* at ——, 116 S.Ct. at 1969 (O'Connor, J., concurring) (quoting S.Rep. No. 97–417 (1982), at 4, *reprinted in* 1982 U.S.C.C.A.N. 177, 181). As Justice Souter has observed, holding that Section 2 is not a compelling

state interest would "bring the *Shaw* cause of action to what would be the cruelly ironic point of finding in the Voting Rights Act of 1965 (as amended) a violation of the Fourteenth Amendment's equal protection guarantee." *Id.* at ——, 116 S.Ct. at 2007 (Souter, J., joined by Ginsburg and Breyer, JJ., dissenting). Accordingly, I hold that remedying a violation of Section 2 of the Voting Rights Act of 1965 is a compelling state interest.

#### (v) *The Requirement of Narrow Tailoring*

In complying with my order to propose a remedy for the Section 2 violation, the Town Board was permitted to elevate race as a districting principle no more than was reasonably necessary to supply the remedy. *See Bush,* 517 U.S. at ——, 116 S.Ct. at 1961. The two-district plan clearly fails to meet this requirement. As I found in my prior decision, a majority-minority district can readily be created in the Town even if race is subordinated to the traditional districting principles of one-person, one-vote, compactness, and conformance with existing political geography. *See Goosby,* 956 F.Supp. at 333, 350. The plan plaintiffs proposed at trial accomplished that result, as does the six-district plan proposed as an alternative by the Town Board. In light of the ready availability of these remedies, there was no need to create the bizarre hybrid two-district electoral plan the Town Board proposed, and it is difficult to fathom why the Town Board would strain so hard to create such a divisive proposal. In any event, the unusual characteristics of the two-district plan defeat any claim that the proposed plan is narrowly tailored to remedy the Section 2 violation. I reject it as violative of the Fourteenth Amendment.[10]

#### b. *The Six–District Plan*

 The six-district plan proposed by the Town Board does not require the application of strict scrutiny. The proposal includes six reasonably compact single-member districts

---

10. In light of this conclusion, I do not address plaintiffs' contention that the two-district plan

violates Section 2 of the Voting Rights Act.

that are not bizarre in shape. District 1, the majority-minority district proposed by the Town Board, is identical to the majority-minority district plaintiffs proposed at trial.[11] That district, as I indicated in my February 20, 1997 decision, is more compact than the average congressional district nationwide and substantially more compact than the average congressional district in the State of New York. *See Goosby,* 956 F.Supp. at 333. Districts 4, 5, and 6 in the Town Board's proposal are very similar to the corresponding districts proposed by plaintiffs, and are likewise sufficiently compact. The only district in the Town Board's proposal which even suggests a lack of compactness is District 3, which (unlike its counterpart in plaintiffs' proposal) has a finger extending north into District 2. However, the demographic data reveal that this finger was not the product of any racial motivation. Accordingly, I conclude that the districts in the Town Board's six-district proposal are sufficiently compact and do not reflect any improper emphasis on racial considerations.

In addition, the six-district proposal, as a general matter, respects local community boundaries in accordance with traditional districting principles. The proposed districts, like those proposed by plaintiffs at trial, reflect an effort to avoid dividing villages and Census Designated Places, thus maintaining communities of interest within the Town. There is no evidence that the Town Board used racial data in an effort to "make more intricate refinements on the basis of race than on the basis of other demographic information." *Bush,* 517 U.S. at ——, 116 S.Ct. at 1953. Nor is there any indication that the Town Board, in drafting its six-district proposal, addressed racial considerations any more than was necessary to comply with Section 2 of the Voting Rights Act.

In short, I conclude that although race naturally played a role in crafting the six-district plan, it was not the predominant factor. I found after the trial that a majority-minority district could be created as part of a six-district plan even if race conscious-

ness was subordinated to traditional districting principles. *See Goosby,* 956 F.Supp. at 333, 350. Since the Town Board proposed a substantially identical plan, it is clear that the proposed six-district plan does not warrant strict scrutiny. *See Bush,* 517 U.S. at ——, 116 S.Ct. at 1969 (O'Connor, J., concurring) ("[S]o long as they do not subordinate traditional districting criteria ... States ... may otherwise take race into consideration, without coming under strict scrutiny.").

Even if it were subject to strict scrutiny, the six-district plan would be constitutional. It is narrowly tailored to the goal of remedying the Section 2 violation created by the current election scheme. The proposal "substantially address[es]" and in fact achieves the "avowed purpose" of remedying the violation, *Shaw II,* 517 U.S. at ——, 116 S.Ct. at 1905, but does not go beyond what is necessary to accomplish that result, *see Shaw I,* 509 U.S. at 655, 113 S.Ct. at 2831. As discussed above, the six proposed districts are not "bizarrely shaped," but are instead compact and contiguous, and there is no evidence that the contours of the districts are "predominantly attributable to gerrymandering that was racially motivated." *Bush,* 517 U.S. at ——, 116 S.Ct. at 1961. I conclude that the six-district plan proposed by the Town Board is narrowly tailored to meet the compelling interest of remedying the vote dilution imposed on black voters in the Town in violation of Section 2 of the Voting Rights Act of 1965.

### C. *The Motion to Enjoin the Upcoming Election*

On September 16, 1997, plaintiffs moved for an order enjoining the November 7, 1997, election under the present at-large system. Plaintiffs do not seek an election under the new electoral plan adopted today. Rather, they seek only to maintain the current Town Board in place. They assert that if an election is held on November 7 under the current system, the African–American communities in the Town will be left without a representative until November 1999, when

---

**11.** The Town Board's proposed District 1 is the same as plaintiffs' proposed District 3, and thus is referred to as District 3 in my prior decision.

the next regular election is scheduled. Plaintiffs thus apparently believe that, if the upcoming election is held, no special election can be held even if they prevail on appeal. *See* Plaintiffs' Memorandum of Law in Support of Motion for Permanent Injunction at 3.

■■■■■■ In deciding whether to enjoin the upcoming election, I am required to "act and rely upon general equitable principles." *Reynolds v. Sims*, 377 U.S. 533, 585, 84 S.Ct. 1362, 1394, 12 L.Ed.2d 506 (1964). Consequently, to prevail on their request for preliminary injunctive relief, plaintiffs must demonstrate that "(1) they will suffer irreparable injury if relief is not granted; (2) there is a substantial likelihood of success on the merits; and (3) the public interest favors issuance of the injunction." *Diaz v. Silver*, 932 F.Supp. 462, 465–66 (E.D.N.Y.1996). In addition, in determining whether a balance of the equities favors the issuance of an injunction, I am "entitled to and should consider the proximity of a forthcoming election." *Reynolds*, 377 U.S. at 585, 84 S.Ct. at 1394. Finally, I note that " 'intervention by the federal courts in state elections has always been a serious business,' not to be lightly engaged in." *Chisom v. Roemer*, 853 F.2d 1186, 1189 (5th Cir.1988) (citation omitted).

Even defendants concede that if plaintiffs prevail on appeal, there is nothing to prevent a special election to remedy the Section 2 violation.[12] Plaintiffs therefore have failed to establish that irreparable injury will result if I decline to grant the relief they request. In addition, the election plaintiffs ask me to enjoin is, at this point, only three weeks away. I find that the balance of the equities

does not support the issuance of an order enjoining the upcoming election. The motion for such an order is therefore denied.

### ORDER

In accordance with the foregoing, it is hereby ORDERED that:

(1) The six-district apportionment plan proposed by the Town Board (and described at A–3 through A–10 hereof) satisfies the requirements of the United States Constitution and Section 2 of the Voting Rights Act of 1965 and is hereby adopted;

(2) The defendants, their agents, servants, and employees, and those persons in active concert or participation with them who receive actual notice of this order by personal service or otherwise, are each restrained and enjoined:

(a) from using the current at-large apportionment plan for the Town Board of the Town of Hempstead in any future elections;

(b) from failing to implement and use the six-district apportionment plan adopted herein; and

(c) from failing to hold a special election under said plan according to a schedule to be determined by the Court at a later time; and

(3) the implementation of the foregoing plan, and the obligations set forth in the section (2) above, are stayed pending appeal.

So Ordered.

---

**12.** *See* Defendants' Memorandum of Law in Opposition to Preliminary Injunction at 6 n. 2 ("Plaintiffs argue that a failure to enjoin the 1997 election would 'delay remedying the Section 2 violation for another two years.' This argument is both unsupported and incorrect.").

Town of Hempstead
Two District Plan

Note: Five members are elected from District Two, one from District One.

A-1

Town of Hempstead
Six District Plan

A–3

**Six District Plan:**

**Census Tract and Block Composition of District One**

District 1 is composed of the following entire Census tracts:

4062.01, 4062.02, 4067, 4068, 4069, 4070, 4071.01, 4071.02, 4072, 4073.01, 4073.02, 4074.01,4074.02, 4075.01, 4075.02, 4139, 4140.01, 4140.02, 4141, 4142.01, 4142.02, 4143.01

Census tracts 4143.02 and 4144 are divided between Districts 1 and 2.

The following Census blocks are in District 1:

Tract 4143.02

Blocks 601, 602, 603, 604, 605, 606, 607, 608, 609, 610, 611, 612

Tract 4144

Blocks 101, 102, 103, 104, 105, 106, 107, 108, 109, 110, 111, 112, 201, 204, 205, 206, 207, 208, 209, 210, 211, 212, 213,

301, 302, 303, 304, 305, 306, 307, 308, 309, 310, 311, 312, 313, 314, 315, 316, 399A, 399B, 401, 402, 403, 404, 405, 406, 407, 408, 409, 410, 411

## A–4, A–5

### Six District Plan:

### Census Tract and Block Composition

### District Two

District 2 is composed of all Census blocks in the Town of Hempstead in the following Census tracts:

3032.01, 3032.02, 3036, 4043, 4044, 4045, 4046, 4047, 4048, 4049, 4050, 4051, 4052, 4053.02, 4058, 4059, 4060.01, 4060.02, 4061, 4063, 4064, 4065.01, 4065.02, 4066

District 2 is composed of the following Census blocks from split Census tracts:

Tract 4053.01

Blocks 504, 505, 508, 509, 512, 513, 701, 708, 709, 715, 716, 801, 802, 803, 804, 805, 806, 807, 808, 809, 810, 811, 812, 813, 814, 815, 816, 817, 818, 819, 820, 821

Tract 4054

Blocks 206, 209, 210, 211, 212, 213, 214, 215, 216, 301, 302, 303, 304, 305, 306, 307, 308, 309, 310, 311, 312, 313, 314, 315, 316, 401, 402, 403, 404, 405, 406, 410, 411, 412, 413, 414, 501, 502, 503, 504, 505, 506, 507, 508, 509, 510, 511, 601, 602, 603, 604, 606, 607, 608, 609, 610, 611, 612, 701, 702, 703, 704, 705, 706, 707, 708, 709, 710, 711

Tract 4055

Blocks 101, 102, 103, 104, 105, 106, 107, 108, 109, 110, 111, 112, 201, 202, 203, 204, 205, 206, 207, 208, 209, 210, 211, 212

Tract 4056

Blocks 101, 102, 103, 104, 105, 106, 108, 109, 110, 113, 117, 201, 202, 203, 204, 205, 206, 207, 208, 301, 302, 303, 304, 305, 306, 502

Tract 4057

Blocks 101, 102, 103, 104, 105, 106, 107, 108, 201, 202, 203, 204, 205, 206, 207, 208, 209, 301, 302, 303, 304, 305, 306A, 306B, 308, 401, 609

Tract 4098

Blocks 101, 102, 103, 104, 105, 106, 107, 108, 109, 110, 111, 112, 201, 202, 203, 204, 205, 206, 207, 208, 209, 210, 211, 301, 302, 303, 304, 305, 306, 307, 308, 309, 310, 311, 312, 313, 314, 401, 402, 403A, 404, 510, 511, 512, 513, 514, 515, 516, 517

Tract 4099

Blocks 101, 102, 103, 104, 105, 106, 107, 108, 109, 110, 111, 201, 202, 203, 204, 205, 206, 207, 208, 209, 210, 211, 306, 401, 402, 403, 404, 405, 406, 407, 408, 409

Tract 4100

Blocks 301, 302, 303, 304, 305, 306, 307, 308, 309, 310, 311, 401, 402, 403, 404, 405, 406, 407, 408, 409, 501, 502, 503, 504, 505, 506, 507, 508, 509, 510

## A–6, A–7

### Six District Plan:

### Census Tract and Block Composition

### District Three

District 3 is composed of all Census blocks in the Town of Hempstead in the following Census tracts:

4101, 4102, 4103, 4104, 4105, 4106, 4107, 4108, 4109, 4110, 4111, 4112, 4113.01, 4113.02, 4114, 4116, 4118, 4163

District 3 is composed of the following Census blocks from split Census tracts:

Tract 4053.01

Blocks 501, 502, 503, 506, 507, 510, 511, 514, 515, 516, 517, 518, 519, 702, 703, 704, 705, 706, 707, 710, 711, 712, 713, 714, 717, 718

Tract 4054

Blocks 101, 102, 103, 104, 105, 106, 107, 108, 109, 110, 111, 201, 202, 203, 204, 205, 207, 208

Tract 4055

Blocks 301, 308, 309, 310, 311, 312, 313, 314, 401, 402, 403, 404, 405, 406, 407, 408, 409, 410, 411, 413, 414, 415, 416, 417, 418, 419, 501, 502, 503, 504, 505, 506, 507, 601, 607, 608, 609, 610, 611, 612

Tract 4056

Blocks 107, 111,112, 114,115, 116, 307, 308, 309, 310, 311, 401, 402, 403, 404, 405, 406, 407, 408, 409, 410, 501, 503, 504, 505, 506, 507, 508, 509, 510, 511, 512, 513, 514

Tract 4057

Block, 307, 402, 403, 404, 405, 406, 407, 408, 501, 502, 503, 504, 505, 506, 507, 508, 509, 601, 602, 603, 604, 605, 606, 607, 608

Tract 4098

Block 403B

Tract 4099

Blocks 301, 302, 303, 304, 305, 501, 502, 503, 504, 505, 506, 507, 508, 509, 601, 602, 603, 604, 605, 606, 607, 608, 609, 610, 611, 612, 613, 701, 702, 703, 704, 705, 706, 707, 708, 709, 710, 711, 712, 713, 801, 802, 803, 804, 805, 806, 807, 808, 809, 810, 811, 812, 813

Tract 4100

Blocks 101,102, 103, 104, 105, 106, 107, 108, 109, 110, 111, 112, 113, 114, 115, 116, 117, 201, 202, 203, 204, 205, 206, 207, 208, 209, 210, 211,212, 213, 214, 215, 216

Tract 4115

Blocks 306, 312, 313, 314, 315, 316, 317, 318A, 318B, 403, 404, 405, 406, 407, 408, 409, 410, 411, 412, 413, 414, 415, 416, 417, 418

Tract 4119.01

Blocks 103, 104, 105, 106, 107, 108, 109, 110, 111, 112, 113, 201, 202, 203, 204, 205, 206, 207, 208, 209, 210, 211, 212, 213, 214, 215, 216, 217, 302, 303, 304, 305, 306, 307, 313, 314, 315, 316, 317

Tract 4119.02

Blocks 301, 302, 303, 304, 305, 318, 319, 401, 402, 403, 404, 405, 406, 407, 408, 409, 410, 411, 412, 413, 414, 415, 416, 417, 418, 419, 420, 502, 503, 504, 505, 506, 507, 508, 509, 510, 511, 513, 514, 516, 517, 518, 519, 601, 602, 603, 604, 605, 606, 607, 608, 609, 610, 611, 612, 613, 614

Tract 4120

Blocks 101, 103, 104, 105, 106, 107, 108, 109, 110, 111, 112, 113, 114, 115, 116, 117, 118, 119, 120, 508, 509, 510, 511, 512, 513, 514, 515, 516, 518, 519, 520, 601, 602, 603, 604, 605, 606, 607, 608, 609, 610, 611, 612, 613, 614, 615, 616, 617, 618, 619, 620, 621, 623, 624,

Tract 4121

Block 508

A–8

**Six District Plan:**

**Census Tract and Block Composition**

**District Four**

District 4 is composed of all Census blocks in the Town of Hempstead in the following Census tracts:

4117, 4122, 4123.01, 4123.02, 4124, 4125, 4126, 4127, 4128, 4129, 4130.01, 4130.02, 4131, 4132, 4133, 4134, 4135, 4136, 4137, 4138.01, 4138.02, 4162.01, 4162.02

District 4 is composed of the following Census, blocks from split Census tracts:

Tract 4115

Blocks 101, 102, 103, 104, 105, 106, 107, 108, 109, 110, 111, 112, 113, 114, 115, 116, 117, 118, 119, 120, 121, 122, 123, 124, 125, 126, 201, 202, 203, 204A, 204B, 205, 206, 207, 208, 209, 210, 211, 212, 213, 214, 215, 216, 217, 218, 219, 220, 301A, 301B, 302, 303, 304, 305, 307, 308, 309, 310, 311

Tract 4119.01

Blocks 101,102, 114, 115, 116

Tract 4119.02

Block 615

Tract 4120

Block 102, 201, 202, 2113, 204, 2115, 206, 207, 208A, 208B, 209, 210, 211, 310, 311, 312, 313, 314, 315, 316, 317, 318, 319, 320, 401, 402, 403, 414, 415, 406, 407, 408, 409, 410, 411, 412, 413, 414, 415, 416, 417, 418, 419, 420, 421, 422, 501, 502, 503, 504, 505, 506, 507, 517, 521, 522, 523, 524

Tract 4121

Blocks 101, 102, 103, 104, 105, 106, 107, 108, 109, 111, 112, 113, 114, 115, 116, 117, 118, 201, 202, 203, 204, 205, 206, 207, 208, 209, 210, 211, 212, 213, 214, 215, 301, 302, 303, 304, 305, 306, 307, 308, 309, 310, 311, 312, 313, 314, 315,

401, 402, 407, 408, 409, 410, 411, 412, 414, 515, 601, 602, 603, 604, 605, 606, 607, 608, 609, 610, 611, 612, 613, 614, 616, 618, 619, 620, 621, 622, 623

### A–9

### Six District Plan:

### Census Tract and Block Composition

## District Five

District 5 is composed of all Census blocks in the Town of Hempstead in the following Census tracts:

4085, 4096, 4097, 4145.01, 4145.02, 4148, 4149, 4151.01, 4151.02, 4152.02, 4153, 4154.01, 4154.02, 4155, 4156, 4157, 4158, 4159, 4160, 4161, 4169

District 5 is composed of the following Census blocks from split Census tracts:

Tract 4143.02

Blocks 101, 102, 103, 104, 105, 106, 107, 108, 109, 110, 111, 112, 113, 201, 202, 203, 204, 205, 206, 207, 208, 209, 210, 211, 212, 213,301, 302, 303, 304, 305, 306, 307, 308, 309, 310, 311,312, 313, 314, 401, 402, 403, 404, 405, 406, 407, 408, 409, 410, 411, 412, 413, 414, 501, 502, 503, 504, 505, 506, 507, 508, 509, 510, 511

Tract 4144

Blocks 501, 502, 503, 504, 505,506,507, 508, 509, 510, 511, 512A, 512B, 513, 514, 515, 516, 517, 518, 519, 520, 521, 522, 525, 527, 528, 530, 531

Tract 4152.01

Blocks 212, 213, 220, 221, 222, 223, 224, 225, 226, 227, 301, 302, 303, 304, 305, 306, 307, 308, 309, 310, 311, 312, 313, 314, 315, 316, 317, 318, 319, 320, 321,-322, 321, 322, 325, 326, 327

### A–10

### Six District Plan:

### Census Tract and Block Composition

## District Six

District 6 is composed of all Census blocks in the Town of Hempstead i the following Census tracts:

4076, 4077, 4078.01, 4078.02, 4079, 4080, 4081, 4082, 4083, 4084, 4086, 4087, 4088, 4089, 4090, 4091, 4092, 4093, 4094, 4095, 4146, 4147, 4150

District 6 is composed of the following Census blocks from split Census tracts:

Tract 4152.01

Blocks 101, 102, 103, 104, 105, 106, 107, 108, 109, 110, 111, 112, 113, 114, 115, 117, 118, 119, 120, 121, 201, 202, 203, 204, 205, 206, 207, 208, 209, 210, 211, 214, 215, 216, 217, 218, 219