180 F.3d 476,
 Dorothy GOOSBY and Samuel Prioleau, Plaintiffs-Appellees,
Xavier Morales and Miladys Morales, Plaintiffs,
v.
TOWN BOARD OF THE TOWN OF HEMPSTEAD, NEW YORK, Gregory P.
Peterson, Richard V. Guardino, Patrick A. Zagarino, Curtis
Fisher, Joseph Ra, Anthony Santino and Joseph Kearney in
their official capacities as members of the Town Board of
the Town of Hempstead, Defendants-Appellants,
Nassau County Board of Elections, John Degrace, Steven
Sabbath, in their official capacities as
Commissioners of Elections of Nassau
County, Defendants.
 Docket No. 97-7403.
 United States Court of Appeals,
Second Circuit.
 Argued June 15, 1998.
Decided June 25, 1999.
 
 Appeal from a final judgment entered in the United States District Court for the Eastern District of New York (Gleeson, J.), after a bench trial, enjoining the Town of Hempstead from using an at-large voting method to elect members to the Town of Hempstead Town Board and ordering that a remedial plan consisting of six single-member districts be adopted by the Town Board, the court having determined that the at-large system violated section 2 of the Voting Rights Act of 1965 as amended and that a remedial plan consisting of one single-member district and one multi-member district violated the Equal Protection Clause of the Fourteenth Amendment.
 Affirmed.
 RANDOLPH M. SCOTT-McLAUGHLIN, White Plains, N.Y. (Frederick K. Brewington, Hempstead, NY, Richard Charles Hamburger and David N. Yaffe, Melville, NY, of counsel), for Plaintiffs-Appellees.
 KATHERINE I. BUTLER, University of South Carolina Law School, Columbia, SC (Evan H. Krinick, Joseph J. Ortego and Kenneth A. Novikoff, Rivikin, Radler & Kremer, Uniondale, NY, of counsel), for Defendants-Appellants.
 (Elaine R. Jones, Norman J. Chachkin, Jaqueline A. Berrien, Victor A. Bolden, Victor Paladino, NAACP Legal Defense and Educational Fund, Inc., New York, NY, Todd A. Cox, NAACP Legal Defense and Educational Fund, Inc., Washington, DC, of counsel) for the NAACP Legal Defense and Educational Fund, Inc., as amicus curiae.
 (Willie Abrams, Dennis Courtland Hayes, National Association for the Advancement of Colored People, Baltimore, MD, of counsel) for the National Association for the Advancement of Colored People, as amicus curiae.
 Before: MINER, McLAUGHLIN, and LEVAL, Circuit Judges.
 Leval, Circuit Judge, concurs in the result in a separate opinion.
 Miner, Circuit Judge:
 
 
 1
 Defendants-appellants the Town Board of the Town of Hempstead, New York (the "Board" or "Town Board"), and Gregory P. Peterson, Richard V. Guardino, Patrick A. Zagarino, Curtis Fisher, Joseph Ra, Anthony Santino and Joseph Kearney, in their official capacities as members of the Town Board,[1] appeal from a final judgment entered in the United States District Court for the Eastern District of New York (Gleeson, J.), following a bench trial, enjoining the Town of Hempstead from the use of an at-large voting method to elect members of the Town Board. The court determined that the at-large method violated section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973, and ordered the Town Board to submit a remedial plan that would divide the Town of Hempstead (the "Town") into six single-member districts. The Town Board thereafter submitted two proposed plans, the first consisting of one single-member district and one multi-member district, which the district court determined violated the Equal Protection Clause of the Fourteenth Amendment. The district court found that the alternative proposal of six single-member districts was consistent with the Equal Protection Clause and ordered that it be adopted by the Town Board.
 
 
 2
 For the reasons that follow, we affirm.
 
 INTRODUCTION
 
 3
 In August of 1988, plaintiffs Dorothy Goosby and Samuel Prioleau brought a class action alleging that the at-large voting method adopted for the election of members to the Town Board violated their rights under the First, Thirteenth, Fourteenth and Fifteenth Amendments of the United States Constitution and section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973. The district court certified a class that included "[a]ll present and/or potentially eligible Black voters residing in the Town of Hempstead."[2] The plaintiffs alleged that the at-large method diluted and submerged their voting strength into the white majority, thereby effectively ensuring that they would not be fairly represented on the Town Board.
 
 
 4
 Following discovery, the Town Board moved for summary judgment, arguing that plaintiffs could not demonstrate legally significant white majority bloc voting, an essential precondition for a successful section 2 claim under Thornburgh v. Gingles, 478 U.S. 30, 50-51, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). The Town Board argued that, because Republican Party affiliation was the determinant of electoral success in Town-wide elections, the "bloc voting" that plaintiffs had demonstrated was along partisan, not racial, lines. The majority bloc that consistently defeated the typically Democratic candidates of choice of the black population was therefore not a "white" majority bloc but simply a Republican one. The district court denied the motion for summary judgment after concluding that the resolution of this issue depended on material issues of fact to be determined at trial.
 
 
 5
 In July and August of 1996, the district court conducted a bench trial at which it heard testimony from fact and expert witnesses produced by each side and received in evidence documents produced by each side. In February of 1997, the district court entered comprehensive Findings of Fact and Conclusions of Law in an opinion that first analyzed whether the at-large election method for Town Board members violated section 2 of the Voting Rights Act under the framework of Gingles, 478 U.S. at 50-51.
 
 
 6
 The district court found that the plaintiffs had satisfied the first two Gingles preconditions, that "the minority group [is] sufficiently large and geographically compact to constitute a majority in a hypothetical single-member district," and that "black voters in the Town are politically cohesive." Goosby v. Town Bd. of the Town of Hempstead, 956 F.Supp. 326, 348, 350 (E.D.N.Y.1997) ("Goosby I ") (citing Gingles, 478 U.S. at 50).
 
 
 7
 In addressing the third Gingles precondition, the district court determined that there was "legally significant white bloc voting" such that "the white majority votes sufficiently as a bloc to enable it usually to defeat the minority-preferred candidate." Id. at 350 (citing Gingles, 478 U.S. at 50-51). Relying on our holding in NAACP, Inc. v. City of Niagara Falls, NY, 65 F.3d 1002, 1019 (2d Cir.1995), the district court noted that there had been, in almost every election, a "most preferred candidate" among black voters. See Goosby I, 956 F.Supp. at 351. This most preferred candidate always lost as a result of white voters voting for another candidate. See id. Having found, through a review of statistical evidence, that there was a "persistent pattern of racially polarized voting," the district court concluded that "this [wa]s sufficient to satisfy the third Gingles precondition." Id. In so doing, the district court implicitly rejected the Town Board's contention that the strong correlation between race and partisan-based voting precluded it from finding "legally significant white bloc voting" unless it first found that partisan politics was a proxy for racial animus in the Town. The district court instead addressed the evidence of partisanship under the "totality of the circumstances" analysis. See id. at 353-55.
 
 
 8
 The district court then noted that the satisfaction of the Gingles preconditions was not in itself sufficient to establish a violation of section 2 of the Voting Rights Act. See id. at 351. Accordingly, it proceeded to evaluate whether, under the "totality of the circumstances," the at-large method of electing Town Board members "impair[ed] the ability of black voters to participate equally in the political process and elect candidates of their choice." Id. at 351. As a guide to this inquiry, the district court used the factors outlined in the Senate Judiciary Committee Report accompanying the passage of the 1982 Amendment to section 2 of the Voting Rights Act (the "Senate Report").
 
 
 9
 The district court proceeded to address and make factual findings regarding the history of discrimination in the Town and other factors concerning the voting power of black voters in the Town. It reviewed the record to make findings addressing electoral mechanisms that enhance vote dilution, the dearth of black candidates elected to the Town Board, the Board's lack of responsiveness to the concerns of the black communities, the inaccessibility to blacks of the Republican Party slating process, evidence of subtle racial appeals in campaigns for Town Board and the justifications offered for retaining the at-large system. See id. at 337-48.
 
 
 10
 The district court then addressed and rejected the Town Board's contentions that "partisan affiliation, not race, best explains the divergent voting patterns among black and white voters in the Town." Id. at 353. It rejected the Town Board's argument that the correlation between race and partisanship created a presumption that partisanship was the controlling factor and the further argument that plaintiffs must establish that racial bias infected the voting community to rebut this presumption. See id. Instead, the district court found that the correlation between race and partisanship was not dispositive but "simply among the many factors to be considered" under the totality of the circumstances analysis. Id. In light of all the surrounding circumstances, the district court found that the divergent voting patterns were better explained by race than by partisanship. See id. at 355.
 
 
 11
 The district court concluded that the at-large system employed for Town Board elections "operated to invidiously exclude blacks from political life in violation of Section 2 [of the Voting Rights Act of 1965]." Id. at 356. The court then ordered the Town to submit "a remedial plan that divides the Town into six single-member districts." Id.
 
 
 12
 In May of 1997, the Town Board submitted two redistricting proposals. The Town Board's favored plan was a two-district system, with one single-member district encompassing the majority of the Town's black population and approximately one-sixth of the Town's total population, and a second five-member district including the remaining five-sixths of the Town's population. The Town Board's alternative plan consisted of six single-member districts, one of which was the same majority black district advanced under the first plan.
 
 
 13
 The district court determined that the two-district plan violated the Equal Protection Clause of the Fourteenth Amendment because it was a race-based plan that was not narrowly tailored to remedy the section 2 violation. See Goosby v. Town Bd. of the Town of Hempstead, 981 F.Supp. 751, 761 (E.D.N.Y.1997) ("Goosby II "). The court found that the six-district plan, however, was not predominantly motivated by race and that even if it were, it was narrowly tailored to remedy the section 2 violation. See id. at 761-62. The district court ordered that the six-district plan be implemented by the Town Board but stayed the implementation pending appeal.[3] See id. at 763.
 
 
 14
 The Town Board now appeals, arguing that the district court erred in finding legally significant white bloc voting as opposed to merely Republican Party bloc voting and in its determination that the proposed two-district plan was unconstitutional.
 
 BACKGROUND
 
 15
 The Town of Hempstead, founded in 1643, is located in Nassau County and consists of twenty-two villages and thirty-four unincorporated areas. According to the 1990 census, the Town had a population of 725,639, making it the most populous town in the United States and more populous than six states and all but thirteen cities.[4] Thus, the U.S. Senators from the smaller states, as well as many members of Congress, represent fewer constituents than each of the members of the Town Board. The Town is the westernmost in Nassau County, Long Island and shares a border with the borough of Queens in New York City.
 
 
 16
 The Town has traditionally been a Republican stronghold; since the inception of Town government in 1907, a member of the Republican Party has won every Town-wide election, including the positions of Presiding Supervisor, Supervisor and Town Board member. Of registered voters in 1993, 48.6% were registered as Republicans, 29.6% were registered as Democrats, and 21.8% were either registered in other parties or expressed no party affiliation.
 
 
 17
 Historically, the Town's citizenry has also been predominantly white. The Town's black population has grown continuously since 1960, when the black population was 3.4% of the total population of 740,738. In 1970, those numbers rose to 5.8% and 801,000 respectively. In 1980, the black population grew to 9.3% of the total population of 738,517 and 7.9% of the Town's total voting age population. In 1990, the black population constituted 12.1% of the Town's 725,639 residents and 11.2% of the Town's voting population while white voters constituted 84.8%. The black population of the Town is concentrated in one area composed primarily of six communities: Roosevelt, Freeport, Hempstead, Lakeview, Uniondale and Baldwin.
 
 
 18
 Whites in the Town have a higher median household income than blacks. There are higher rates of poverty and unemployment among blacks, and a higher percentage of whites are employed in white-collar jobs. Whites are also more likely to have achieved a higher level of education and more likely to own a home, a car and a telephone. On average, the homes owned by blacks are less valuable than the homes owned by whites. Despite the foregoing, blacks in the Town are relatively affluent. Blacks in the Town have a higher median household income than either whites or blacks in the United States or in New York State. Moreover, blacks in the Town surpass national averages for blacks nationwide in home ownership and home value.
 
 
 19
 There is a correlation between race and political party affiliation in the Town. Among white registered voters, 51% registered as Republicans, 26% as Democrats and 23% in another party or in no party. Among black registered voters, however, only 22% registered as Republicans, while 68% registered as Democrats and 10% in another party or expressed no party affiliation. At the time of trial, registered black voters accounted for 4% of registered Republican voters and 18% of Democratic voters.
 
 
 20
 The Town's legislative body, the Town Board, currently consists solely of Republican members who were elected under an at-large voting system. As noted, no Democrat has ever been elected to the Board. Before the election of one black member in 1993, the Town Board had also always been composed only of white members.
 
 
 21
 The method of electing members to the Town Board, and the results that it has produced, is at the heart of this law suit. The Town Board has six members,[5] each of whom is elected at-large to serve a four-year term. These elections are staggered so that three members, or half the Board, are elected every two years. Under the current at-large system, each voter may cast up to a total of three votes, one for each vacant seat on the Board, but may cast only one or two votes if the voter desires to do so. This practice is referred to as "single-shot" voting. Casting multiple votes for one candidate, or cumulative voting, is prohibited. The three candidates who receive the highest vote total take office as Town Board members; a candidate need not receive a majority of votes to assume a seat on the Board.
 
 
 22
 The Town Board is the principal arm of the Town government. It is the Board's function, as the representative body of the Town government, to identify and resolve matters of importance to Town residents. The Board's formal legislative powers and responsibilities include naming Town government officials and filling vacant Town government positions, adopting a Town budget and administering Town finances, establishing residential and commercial zoning, acquiring, selling and maintaining Town property, maintaining and repairing Town streets, parks and facilities, removing fire and health hazards and awarding and executing Town contracts. The Town employs roughly 2,400 people and had an annual budget of $290 million in 1996.
 
 
 23
 The Republican Party has a pervasive presence in both the social and the political life of residents of the Town. Membership in the party is essential for election and appointment to Town office and generally for employment in Town government positions. Within the Town, neighborhoods and communities form Republican social clubs, which are intended to enhance camaraderie and activism. The official governing bodies of the Republican Party organization are the Town and County Republican committees. Two committee members are selected by the Republican electorate in each election district. For the purpose of electing executive leaders, various election districts are grouped together to form an "executive area," which is an informal geographical designation. For example, the executive area of East Meadow contains 26 election districts, and therefore the Republican committee in East Meadow has 52 positions for committee members. These executive leaders meet with the vice-chairs[6] of the Nassau County Republican Party and the Nassau County Republican Party chairman ("county chairman") in executive committee meetings to discuss Republican Party business.
 
 
 24
 Republican candidates for elected office within the County are nominated through a slating process. First, the 69 executive leaders, three of whom are black, caucus among themselves and with the county party vice-chairmen to discuss potential candidates. The executive leaders then forward the resumes of potential candidates to the county chairman. Religious organizations, service organizations, business groups and civic associations often recommend candidates to executive leaders and the county chairman. The Nassau County African American Republican Coalition ("NCAARC") is one such association that has been active in recommending candidates. The county chairman selects a potential candidate for each office from those recommended to him and then recommends the candidate to the other members of the executive committee for nomination. After receiving the chairman's selection, the executive committee forwards its recommendation to the entire committee for a final vote at the party convention. The convention consists of the approximately 2,000 committee members from the various local committees within Nassau County. The vote of each delegate at the convention is weighted according to the Republican voter turnout in the previous election in the committee member's election district. This slating process is the same for Town-wide elections, except that participation is limited to executive leaders, vice-chairs, and delegates who represent a constituency in the Town.
 
 
 25
 Neither the executive committee nor the Republican convention has ever rejected the county chairman's recommendation. Further, the Republican Party has never held a primary election to determine a nominee for Town Board. Though it has nominated blacks for some elective offices, as detailed below, only once has the Republican Party nominated a black for Town Board member. In 1989, a group of black Republicans in the Town, including members of the NCAARC and several ministers, marched on Town Hall to protest the Town Board's failure to appoint a black Republican to the Board to fill either of the two Board vacancies in that year or the two vacancies in 1987.
 
 
 26
 In 1993, another vacancy arose on the Board. The NCAARC recommended that attorney Lance Clark, an active black Republican committeeman and Deputy Mayor and Trustee of the Village of Hempstead, be appointed to fill this vacancy. Members of the NCAARC preferred Clark to another possible African-American candidate for Town Board, Curtis Fisher, because Clark had "paid his dues" and would represent the interests of the Town's black community vigorously. Clark was not, however, interviewed for the appointment. Instead, County Chairman Mondello recommended that Fisher be appointed to fill the vacancy and the Board accepted the recommendation. Fisher thereafter was unanimously recommended by the executive committee and the Republican committee for nomination as the Republican candidate for Town Board. He was subsequently elected as an incumbent to retain the seat to which he had been appointed. He received the most votes that any candidate had received in over a decade, with 49.2% of the white vote and 29.5% of the black vote.
 
 
 27
 Curtis Fisher is the only black person ever to sit on the Town Board. Fisher was raised in the Lakeview area but currently resides in the predominantly white community of Baldwin Harbor. Before his appointment to the Town Board, Fisher was an executive assistant to the Town Board in 1988, and served as Affirmative Action Officer for the Town beginning in 1989. He is a close friend and tennis partner of County Chairman Mondello.
 
 
 28
 Several black Republicans have won election to judicial office in districts that include the Town. Between 1989 and 1992, two black Republicans were elected to judicial office in District Two of the Nassau County District Court. District Two consists of the Town and the City of Long Beach, which had a population of 33,510 in 1990. Candidates for these judicial offices are nominated through the same slating process as candidates for the Town Board. At least one of the judges elected was not the preferred candidate of black voters in the Town. Between 1989 and 1992, two black justices were also elected to the Tenth Judicial District of the New York State Supreme Court, which includes all of Nassau and Suffolk Counties. According to the 1990 Census, these two counties had a combined population of 2,609,212, meaning that the Town's population was less than 30% of the entire population from which these justices were elected. The slating process for candidates for justice of the New York State Supreme Court involves nomination at a convention of delegates selected from the entire judicial district. See N.Y. Election Law § 6-106 (McKinney 1998).
 
 
 29
 Although other blacks have been elected to office within segments of the Town, the segments from which they were elected are predominantly black. The 18th Assembly District, which includes 81% of the black population of the Town, has elected black Democrats to the State Assembly in each election between 1986 and 1992. James Garner was elected as Mayor of the Village of Hempstead, Lance Clark as Trustee and Deputy Mayor of the Village of Hempstead, and Darlene Harris as a Republican representative from Roosevelt to the Nassau County legislature.[7]
 
 
 30
 The Town Board has been criticized for being unresponsive to the needs of the black community. A few incidents involved the Town Board's failure to address racial intolerance in Town workplaces. The Town does not have an affirmative action policy, but only a vague standard prohibiting Town employees from using racial slurs. Complaints of discrimination have been handled informally rather than through an administrative process or the courts.
 
 
 31
 For example, during Curtis Fisher's tenure as Affirmative Action Officer, a black labor foreman at the Department of Sanitation complained that he was given unfavorable labor assignments and insulted by racial epithets. Fisher made casual inquiries but did not file a report or recommendation with the Town Board, nor did he initiate any disciplinary process or training to combat bigotry in the workplace. At trial, he admitted that he did not know whether the employees who had antagonized the labor foreman had been disciplined.
 
 
 32
 In a second incident, a Jamaican immigrant who worked as a part-time carpenter for the Town was passed over for full-time employment in favor of two less senior white carpenters. The carpenter complained to Fisher, by this time a member of the Town Board. Fisher spoke with the Town's Personnel Director and then reported back to the carpenter that there was nothing he could do. The carpenter subsequently prevailed on a discrimination claim against the Town. In a third incident, the Town Board was informed that a trophy on display at the Freeport Volunteer Fire Department bore a Ku Klux Klan inscription yet failed to do anything about it.
 
 
 33
 Black residents have also complained that the Town Board has neglected projects that affect the black community. For example, residents in Lakeview have repeatedly sought funding for a community center, but have been unsuccessful. Councilman Fisher, as de facto representative of this community, see infra, did not attempt to obtain funding for this project. To justify his inaction, Councilman Fisher explained that funding such a project would require funding several similar projects in other communities. All but one of these funding requests, however, were from other predominantly black communities. Councilman Fisher did not attempt to obtain funding for any of these other community projects either. Additionally, Fisher has not forwarded a recommendation for a sorely-needed redevelopment of the Roosevelt Town Center to the Town Board, although this has been an issue in that community since at least 1992.
 
 
 34
 The Town has not been entirely unresponsive to the concerns of its black residents, however. There have been a number of development and construction projects in predominantly black neighborhoods. The record reflects that Robert Francis, a black Republican serving as Commissioner of Economic Development, has consistently worked to respond to the concerns of black communities within the Town.
 
 
 35
 Moreover, there is no history of official discrimination against blacks in the Town. Neither the adoption nor the retention of the at-large system seems to have been motivated by racial animus. Historically, however, there have been two provisions of law that have had a discriminatory effect on blacks.
 
 
 36
 From 1922-1969, Nassau County required each citizen to present a certificate of literacy in order to vote. It appears that the literacy test had a disproportionate impact on blacks' ability to vote. Also, more blacks than whites were disenfranchised by a New York Election Law provision that purged voters from the election rolls if they failed to vote for four successive years. N.Y. Election Law section 5-406 (McKinney 1998), repealed in 1995, purged 56% more voters in predominantly minority election districts than in predominantly white election districts. A registered black voter in the 18th Assembly District, a majority-minority district from which a member of the New York State Assembly is elected, was 70% more likely to be purged from the voting rolls than a registrant from any other assembly district in the Town.
 
 
 37
 Subtle racial appeals have been made, from time to time, in Republican campaigns for elected office within the Town. These racial appeals might be attributable to the heightened racial tension that has resulted from blacks resettling from predominantly black neighborhoods in the adjacent borough of Queens in New York City to predominantly white neighborhoods in the Town.
 
 
 38
 The first instance noted in the record of racial appeals in Town elections occurred in a late 1970s campaign for a State Senate seat. The Republican candidate in that election distributed brochures containing pictures of black children in school buses to indicate that support of his Democratic opponent would result in a busing program.
 
 
 39
 A later appeal of the same nature occurred in 1987 in the campaign of incumbent Town Board member Joseph Cairo. Cairo, reacting to an influx of blacks into the communities of Elmont and North Valley Stream, distributed campaign literature proclaiming that he was "a major opponent of those who would seek to 'Queensify' North Valley Stream and its environs." There was evidence that Cairo's claim to have "sensitized local patrolmen to the special concerns of the community" meant that police were to act as an unofficial border patrol, confronting black youths from Queens who ventured into the Town. Though the claims in the brochure may be subject to different interpretations, there was testimony that the campaign literature was perceived at least by some in the electorate to be a racial appeal.
 
 
 40
 There is evidence that the sheer geographical size of the Town is a barrier to black voting strength. According to testimony at trial, campaigning is made more difficult because of the resources required to visit, distribute literature to, and address issues in all parts of the Town. When contrasted with blacks' abilities to elect their preferred candidates in smaller districts like the 18th Assembly District and Nassau County legislative districts, the size of the Town is a factor in reducing the chance that a minority candidate will be elected to the Board.
 
 
 41
 At trial, the plaintiffs' expert in districting, Dr. Andrew Beveridge, testified that the Town can be divided into six single-member districts, one of which would be a majority-minority district. Dr. Beveridge followed four principles in establishing these districts: (1) substantial equality of population; (2) conformity of the districts' boundaries, to the extent possible, to existing political geography; (3) reasonable compactness; and (4) after satisfying the first three criteria, grouping the black population in one district to the extent possible. The six districts proposed by Dr. Beveridge each include roughly the same number of constituents, 120,000. The largest district is 1.67% larger than 120,000, and the smallest district is only 2.53% smaller than 120,000.
 
 
 42
 Proposed District 3, the majority-minority district with blacks constituting 52.47% of the voting age population, follows existing political boundaries with minor exceptions. It departs from the boundaries of villages and Census Designated Places only in two places. Proposed District 3 includes Lakeview, Roosevelt, Freeport and Hempstead, the four predominantly black communities in the Town. Its boundaries roughly trace the boundaries of the 18th Assembly District. Using a standard measure of compactness, District 3 is somewhat less compact than the average of the other five districts in the proposed plan. It is nonetheless more compact than the average United States Congressional district, both nationwide and in New York State. It is also more compact than the 18th Assembly District.
 
 
 43
 There is no dispute among the parties that blacks within the Town are cohesive in their support for Democratic candidates for Town Board. Further, based on a statistical "performance analysis," another expert for the plaintiffs, Dr. Michael D. MacDonald, concluded that it was reasonable to believe that a candidate preferred by black voters would win in the proposed majority-minority district.
 
 
 44
 Dr. MacDonald testified that there has been white bloc voting in the Town. Dr. MacDonald examined the results in elections for Town Board seats and compared candidates' Town-wide support with support for candidates in the majority-minority 18th Assembly District. From this comparison, he drew the preliminary conclusion that black-preferred candidates would have fared better if they could have run in a majority black district. However, because this analysis was insufficiently precise to measure the differences in support between black and white voters, Dr. MacDonald proceeded to a second step in his analysis.
 
 
 45
 Using "ecological correlation and regression analysis" and "extreme case analysis," Dr. MacDonald measured the strength of the relationship between the race of a voter and support for a particular candidate. Because each of these methods provides only an estimate, he applied each method to voters of various areas to attempt to achieve consistent results. Analyzing the results in Town Board elections from 1983 to 1993, Dr. MacDonald assembled a set of data. From these data, Dr. MacDonald concluded that there had been a pattern of racially polarized voting in each of the Town Board elections. The defendant's expert, Dr. Harold W. Stanley, reached a similar conclusion using a slightly more detailed analysis. In Town Board elections from 1983 to 1993, the winning candidates received between 15% and 29% of the black vote and between 49% and 62% of the white vote. The difference between white and black support for a given candidate was less than 20 percentage points on only one occasion and usually exceeded 30 percentage points.[8] The data reveals that the white Republican majority consistently defeats the Democratic candidates, who are supported by the black minority. Ultimately, both sides agree that there is polarized voting but dispute its cause.
 
 
 46
 At trial, the Town Board offered several justifications for the continued use of the at-large system. The Town Supervisor testified that the at-large method brought about "less government[,] not more government," and that the at-large system ensured an "open" atmosphere in which each Town Board member was responsible for the welfare of every citizen in the Town. Further, he testified that a district-based system might encourage a more parochial mentality in which Board members would combine their votes, for example, to place undesirable facilities in a district represented by a Democrat.
 
 
 47
 The Town Supervisor also testified that, due to the size of the Town Board's constituency, the Town has been divided into de facto districts that are made up of the areas where the Board members reside or areas for which they are otherwise assigned responsibility. Under this de facto district system the Town Supervisor assigns geographic areas to each Board member, and it is generally understood that the assigned Board member will be responsible for addressing the concerns of constituents within his assigned region. Because no Board member has ever resided within the areas of the Town that are predominantly black, the Town Supervisor has assigned a Board member from outside the community to address the needs of the black communities. Since 1993, Curtis Fisher has been the member assigned to address the needs of the predominantly black areas of the Town.
 
 
 48
 Dr. Stanley, the Town Board's expert, introduced the results of a regression analysis designed to examine the relationship between partisanship and race. He concluded, first, that higher percentages of blacks support Democratic candidates and higher percentages of whites support Republican candidates. He then assessed the results of two regression analyses, one comparing partisan composition of an election district with support for a candidate, the second comparing racial composition of an election district with support for a candidate. He found that changes in the partisan composition of a district created a greater variance in support for a candidate than changes in the racial composition of a district. Thus, Dr. Stanley concluded that the partisan composition of a district was a stronger determinant of candidate success than the racial composition of a district.
 
 
 49
 Additionally, Dr. Stanley found that candidates received similar levels of support from the electorate regardless of the race of the candidate. In other words, when Curtis Fisher ran for Town Board, the level of support he received from white voters was similar to that received by white Republican candidates for Town Board. Dr. Stanley ultimately concluded that, though there was a pattern of racially polarized voting in the Town, there was a stronger pattern of voting along partisan lines.
 
 DISCUSSION
 
 50
 At the outset, we set forth the statutory provisions that govern the Voting Rights Act violation claim put forward by the plaintiff class:
 
 
 51
 (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.
 
 
 52
 (b) A violation of subsection (a) of this section is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.
 
 
 53
 42 U.S.C. § 1973 (1994).
 
 
 54
 In accordance with the foregoing, then, a violation of the Voting Rights Act must be based on proof of the following elements in combination: (1) a voting standard, practice, procedure, qualification or prerequisite (2) imposed by a State or political subdivision (3) in a manner that denies or abridges the right of any citizen to vote (4) on account of race, color or membership in a language minority group.[9] Moreover, the totality of the circumstances must demonstrate that (1) the political processes for nomination and election (2) are not equally open to participation by members of the protected class (3) because the class members have less opportunity than others to participate and elect their representatives of choice. One circumstance to be considered in the totality is the extent to which class members have been elected, but there is no right to proportional representation.
 
 
 55
 The Supreme Court established the basic framework for analysis of claims of unlawful dilution of minority voting strength under the Voting Rights Act in Thornburg v. Gingles, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). In Gingles, black citizens of the State of North Carolina claimed that a redistricting plan for the state legislature involving multi-member districts violated the Act by diluting black voting strength. The Court instructed that the following three circumstances are "necessary preconditions" to a finding of vote dilution:
 
 
 56
 First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single member district.... Second, the minority group must be able to show that it is politically cohesive....
 
 
 57
 Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it--in the absence of special circumstances, such as the minority candidate running unopposed--usually to defeat the minority's preferred candidate.
 
 
 58
 Id. at 50-51 (citations and footnotes omitted).
 
 
 59
 Additionally, the Court identified the following factors, listed in the Senate Report, as typically relevant to a vote dilution inquiry:
 
 
 60
 the history of voting-related discrimination in the State or political subdivision; the extent to which voting in the elections of the State or political subdivision is racially polarized; the extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority vote requirements, and prohibitions against bullet voting; the exclusion of members of the minority group from candidate slating processes; the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; the use of overt or subtle racial appeals in political campaigns; and the extent to which members of the minority group have been elected to public office in the jurisdiction.
 
 
 61
 Id. at 44-45. Two other factors listed in the Senate Report also were said to have probative value in some cases:
 
 
 62
 evidence demonstrating that elected officials are unresponsive to the particularized needs of the members of the minority group and that the policy underlying the State's or the political subdivision's use of the contested practice or structure is tenuous.
 
 
 63
 Id. at 45.
 
 
 64
 Despite the apparent comprehensiveness of the foregoing factors, the Court accepted the Senate Report's view that the list is neither exclusive nor comprehensive, that no specified number of factors need be proved, and that it is not necessary for a majority of the factors to favor one position or another. See id. The Senate Report does, however, provide important guideposts for the factual analysis to be undertaken by the trial court. Accordingly, although the three Gingles preconditions generally must be satisfied, their satisfaction is not alone sufficient to make out a Voting Rights Act violation. See Johnson v. DeGrandy, 512 U.S. 997, 1013, 114 S.Ct. 2647, 129 L.Ed.2d 775 (1994). The "totality of the circumstances" test prescribed by the statute must also be applied to the evidence, since "the ultimate conclusions about equality or inequality of opportunity were intended by Congress to be judgments resting on comprehensive, not limited, canvassing of relevant facts." Id. at 1011. The Supreme Court has made it clear that resolution of the question of vote dilution is a fact intensive enterprise to be undertaken by the district court. And while we are required to see to the proper application of governing legal principles under a de novo standard of review, we are constrained to apply a clearly erroneous standard of review to the district court's ultimate findings of vote dilution, thereby "preserv[ing] the benefit of the trial court's particular familiarity with the indigenous political reality without endangering the rule of law." Gingles, 478 U.S. at 79.
 
 
 65
 The district court made careful factual findings in determining that the three Gingles preconditions had been satisfied in the case at bar. The first precondition--a sufficiently large and geographically compact minority group--was found satisfied through the testimony of Dr. Beveridge, the districting expert for the plaintiff class. See Goosby I, 956 F.Supp. at 348. His division of the Town into six voting districts produced one district consisting of the Town's four predominantly black communities. This proposed District 3 was found to be more compact than the average congressional district. See id. at 349. The second precondition--a politically cohesive minority group--was not disputed in the district court. See id. at 350. Moreover, Dr. McDonald, another expert for the plaintiff class, opined that "one could reasonably expect that a candidate preferred by black voters could win in a single-member district system." Id. at 334. On appeal, the Town does not challenge the district court's finding as to the first two Gingles preconditions. Those findings, in any event, are fully supported in the record.
 
 
 66
 The Town contends that the third Gingles precondition--that the white majority votes sufficiently as a bloc usually to defeat the preferred candidate of the minority--has not been satisfied. This contention is not, however, bottomed on a lack of evidence of "sufficient white majority bloc voting to frustrate the election of the minority group's candidate of choice." Voinovich v. Quilter, 507 U.S. 146, 158, 113 S.Ct. 1149, 122 L.Ed.2d 500 (1993). Indeed, the district court found racially polarized voting on the basis of the following undisputed facts: (1) a black Democrat candidate who ran for the Town Board always was the most preferred candidate among black voters; (2) the black Democrat received over 50% of the black vote in every election but one; (3) in every Town board election but one there was at least one minority-preferred candidate; and (4) every minority-preferred candidate for the Town Board lost to the majority-preferred candidate as a result of white voters voting for candidates not supported by black voters. Goosby I, 956 F.Supp. at 351.
 
 
 67
 The contention of the Town in regard to the third Gingles precondition revolves around the argument that lies at the heart of its appeal--that political partisanship is the reason that white bloc voting occurs in Town elections. According to the Town, white bloc voting patterns cannot be legally significant under the third Gingles precondition where the divergent patterns are not attributable to race but to partisan affiliation. The Town of course asserts that the historical white bloc voting pattern in Town elections is merely an expression of political partisanship--the vast majority of white voters in the Town have voted Republican since time immemorial. The response to that argument at this point in the analysis is that inquiry into the cause of white bloc voting is not relevant to a consideration of the Gingles preconditions. In this, we agree with the Fourth Circuit's reading of Gingles.
 
 
 68
 We think the best reading of the several opinions in Gingles, however, is one that treats causation as irrelevant in the inquiry into the three Gingles preconditions, see Gingles, 478 U.S. at 62, 106 S.Ct. at 2772 (Brennan, J., plurality opinion) but relevant in the totality of circumstances inquiry, see 478 U.S. at 100, 106 S.Ct. at 2792 (O'Connor, J., concurring in judgment) (agreeing that use of racial polarization data "solely" to prove Gingles second and third elements cannot be rebutted by "evidence that the divergent racial voting patterns may be explained in part by causes other than race," but disagreeing with plurality's claim "that such evidence can never affect the overall vote dilution inquiry.").
 
 
 69
 Lewis v. Almance County, N.C., 99 F.3d 600, 616 n. 12 (4th Cir.1996); see also Milwaukee Branch of the NAACP v. Thompson, 116 F.3d 1194, 1199 (7th Cir.1997) (reasons why candidates preferred by black voters lost should be considered in totality of circumstances inquiry); Vecinos De Barrio Uno v. City of Holyoke, 72 F.3d 973, 983 (1st Cir.1995) (non-racial reasons for divergent voting patterns to be considered under totality of circumstances test); Nipper v. Smith, 39 F.3d 1494, 1524 (11th Cir.1994) (in order for plaintiff to prevail where defendant offers proof that voting patterns can best be explained by non-racial circumstances, showing must be made under totality of circumstances that minority group denied meaningful access to political process).
 
 
 70
 We therefore ratify the approach taken by the district court to consider the political partisanship argument under the "totality of circumstances" analysis rather than as part of the third Gingles precondition. See Goosby I, 956 F.Supp. at 337, 355. The Town has made no showing that the factual findings of the district court supporting satisfaction of the third Gingles precondition are clearly erroneous. The conclusion that there was legally sufficient bloc voting to defeat minority-preferred candidates in the Town is reinforced by application of the following bright-line rule that we announced and applied in City of Niagara Falls, 65 F.3d at 1019:
 
 
 71
 For purposes of analyzing the third prong of Gingles, in § 2 cases in which the plaintiffs seek to replace an at-large, multimember electoral system with a series of single-member districts of which one or more would be a so-called majority-minority district, a candidate cannot be "minority-preferred" if that candidate receives support from fewer than 50% of minority voters. When a candidate receives support from 50% or more of minority voters in a general election, a court need not treat the candidate as minority-preferred when another candidate receiving greater support in the primary failed to reach the general election. Finally, even if a candidate receives 50% or more of the minority vote, a court need not treat the candidate as minority-preferred if another candidate receives significantly higher support.
 
 
 72
 No winning candidate ever has received 50% of the minority vote in general elections in the Town, and there have been no Republican primary elections there. Thus, the third Gingles precondition is established because the white majority always has voted sufficiently as a bloc to defeat the preferred candidate of the minority.
 
 
 73
 The district court undertook an extensive examination of the factual circumstances of this case in their totality, making specific findings as to each of the Senate Report factors. See Goosby I, 956 F.Supp. at 337-48. With respect to the history of racial discrimination, the district court found that the former state election law provision requiring the purging of voters who failed to vote in four successive years had a discriminatory impact on black voters. See id. at 337-38. Apparently, the rate of purging was 56% greater in predominantly minority election districts than in predominantly white districts, and a black registrant in the 18th Assembly District had a 70% greater chance of being purged for non-voting than a randomly selected registrant from one of the other assembly districts in the Town. The purging ceased in 1990 following the issuance of a temporary restraining order and the Town's subsequent consent to permanent injunctive relief. The district court also found it to be a "fair inference" that a literacy test administered in Nassau County during the years 1922-1969 had a discriminatory impact on blacks. Id. at 338. Addressing the degree of polarized voting, the district court found from the data submitted that the successful candidate at every Town election from 1983 to 1993 received between 15% and 29% of the black vote and between 49% and 62% of the white vote. (Curtis Fisher actually received 29.5% of the black vote in 1993, the highest percentage for any prevailing candidate in any Town Board election.) The district court found a "persistent and significant degree of racial polarization in Town Board elections." Id.
 
 
 74
 As to electoral mechanisms that enhance vote dilution, the district court found that the size of the Town, one of the largest undivided voting districts in the nation, makes campaigning much more difficult. See id. at 339. Campaign financing is especially difficult in such a large district for black candidates, who have been able to campaign more effectively in smaller districts in Nassau County. The lack of access to the candidate slating process is a factor that the district court examined in great detail, making extensive factual findings that will be discussed later in this opinion. See id. at 339-40. Suffice it to say at this point, those findings are well-supported by all the testimony bearing on this factor and support the conclusion that "Town Board seats were sufficiently beyond the realm of possibility for black Republicans that they never even attempted to obtain one through the normal party mechanisms until 1993. And then they were simply shut out." Id. at 341.
 
 
 75
 In connection with discrimination in other areas which hinders blacks' ability to participate in the political process, the district court examined the socioeconomic status of blacks who reside in the Town and the relationship between that status and participation in the political process. See id. at 342. Despite a finding of some income differential and disparity in educational levels, the district court concluded that "differences in the socioeconomic status of blacks do not significantly impair their relative ability to participate in the political process." Id. Although not present in recent years, racial appeals have found their way into political campaigns in the area. Anti-black sentiment was manifested in literature warning of the spillover of urban crime from New York City, which was perceived as a promise to keep blacks from crossing the border into Nassau County. See id. at 343. The district court identified a "pattern of Republican campaign materials that were characterized by subtle racial appeals, which sought to depict the integration of white areas as a threat, and to prey on the fear of such a threat." Id.
 
 
 76
 Assessing the factor of minorities elected to public office, the district court found that only one black was elected to Town office since the establishment of the Town Board. That one was Curtis Fisher, a Republican who was appointed to the Board in 1993 and elected the same year. Although black Republicans have been appointed or elected to other offices in the surrounding area, and blacks have been appointed to a number of positions in the Town, the fact remains "that until the election of Curtis Fisher in 1993, no African-American was ever elected to the legislative body at issue in this case." Id. at 344. According to the district court, there is substantial evidence that the Town Board has not been responsive to the particular needs of the Town's black community. See id. at 344-46. Supporting this conclusion are a number of findings--the lack of an affirmative action policy; the failure to take action in a case involving racial slurs in the workplace; the failure to respond to a complaint of race discrimination in employment that ultimately resulted in a judgment against the Town; the denial or disregard of funding requests for community centers in the black communities; the lack of training for the Town's Affirmative Action Officer; and the insensitivity of the Town Board to evidence of racism in a village fire department for which the Town provides financial support.
 
 
 77
 The last of the Senate Report factors listed (the second of the two additional factors said to have probative value) is the tenuousness of the policy underlying at-large elections. As to that factor, the district court determined that the purported advantages cited by the Town in support of the at-large system--the drawbacks of "more government"; the difficulties residents would suffer if a weak representative were elected from their district; and a parochial approach to Town government--were tenuous. Specifically, the district court found that the black communities in the Town do not have a Town Board member accountable to them under the present system. See id. at 347. The Town Supervisor assigns responsibility for portions of the Town to Board members, but the district court found that "[t]he Councilmembers, who in most instances ignore the concerns of the black communities, can afford to do so because they can count on receiving sufficient votes from other areas to keep their seats on the Town Board." Id. The court found it significant that Curtis Fisher, who does not reside in a black community, was assigned responsibility as a Town Board member for Lakeview, a predominantly black community. See id. The most tenuous aspect of the defense of the at-large system, according to the district court, was the contention that it results in better government for the black communities. See id. Under standards established for review of factual findings, we cannot say that any finding made by the district court in its review of the Senate Report factors is clearly erroneous.
 
 
 78
 Whether brought forward under the third Gingles precondition or under the totality of circumstances test, the principal and pervasive argument of the Town is that political partisanship, rather than race, accounts for the defeat of black candidates. The Town puts it this way on page 2 of its Brief: "The Town contends that blacks have lost as Democrats, not as 'blacks.' Because plaintiffs never attempted to establish that blacks' inability to elect Democrats was tied to their race, plaintiffs' claim of racial vote dilution was a mere euphemism for defeat at the polls and legally insufficient." The foregoing represents a fundamental misunderstanding of what the plaintiff class alleged and proved to the satisfaction of the district court. The claim was that the at-large system of voting made it impossible for blacks to elect their preferred candidates. The Town's argument implies that if blacks registered and voted as Republicans, they would be able to elect the candidates they prefer. But they are not able to elect preferred candidates under the Republican Party regime that rules in the Town. Moreover, blacks should not be constrained to vote for Republicans who are not their preferred candidates.
 
 
 79
 The Supreme Court instructs that a Voting Rights Act violation occurs when "a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." Gingles, 478 U.S. at 47. The electoral law at issue provides for at-large voting for Town Board members. The historical conditions implicated are the Republican Party's hegemony over the Town of Hempstead since the Town's inception over 90 years ago, the slating process by which candidates are selected by the Republican Party, and the predilection of the great majority of blacks to vote for Democrat candidates. The concatenation of these conditions has resulted in the vote dilution of which the plaintiff class complains and the consequent inability of blacks to elect their preferred candidates.
 
 
 80
 The Republican slating process in the Town is unique. Although the Republican Committee members in the Town of Hempstead theoretically are empowered to choose a slate of candidates for the Town Board, the actual selection process has been much different. The Committee members have ceded their authority to the County Chairman, who designates the Town slate. The choice of candidates is his alone, although any number of people may suggest potential candidates. The present Nassau County Chairman, Joseph Mondello, has served in that capacity for some fifteen years. While black Republicans could mount a primary campaign to secure the Republican nomination for Town Board for a preferred candidate, it would be futile to do so. The Chairman-preferred candidate would always win in a Town-wide primary election, due to the overwhelming strength of the monolithic Republican organization. In any event, black Republicans had never even attempted to secure a nomination for a preferred candidate through normal party procedures until 1993. The events of that year reveal the one-man, no-vote mechanism that prevails in the Republican Party in the Town of Hempstead and in the County of Nassau.
 
 
 81
 When the Board vacancy occurred in 1993, the NCAARC advanced the name of Lance Clark, a black attorney who then was serving as Deputy Mayor and Trustee of the Village of Hempstead. The pressure had been on to get a black-preferred member of the Town Board since black Republican leaders marched on the Town Hall demanding such action in 1989. Clearly, Clark was the preferred candidate of the black Republicans and the black community. Nevertheless, Chairman Mondello, who then served as Presiding Supervisor of the Town as well as Nassau County Republican Chairman, saw to the appointment of Curtis Fisher, a black crony, to fill the vacancy and to be nominated and elected later that year to serve on the Town Board.
 
 
 82
 Without access to the Republican slating process, blacks simply are unable to have any preferred candidate elected to the Town Board, given the historical success of the Republican Party in all Town Board elections. This stands in sharp contrast to the situation described in League of United Latin American Citizens ("LULAC") v. Clements, where minority candidates were slated by both parties. See 999 F.2d 831, 861 (5th Cir.1993); see also Clarke v. City of Cincinnati, 40 F.3d 807, 812-13 (6th Cir.1994) (finding no unlawful vote dilution when 47% of minority-preferred candidates were elected under at-large system). Because it could be said that white voters, both Democrat and Republican, supported minority candidates elected by their parties at levels equal to or greater than those of white candidates, it was proper to conclude in that case "that divergent voting patterns among white and minority voters are best explained by partisan affiliation." LULAC, 999 F.2d at 861. Such is not the case here, although the Town argues otherwise. Due to the county chairman's control of the slating process and without an open Republican primary, black Republicans have been unable to advance their preferred candidates as nominees for the Town Board. Cf. id. Without the Republican nomination, black-preferred candidates cannot be elected to the Town Board.
 
 
 83
 The Town directs our attention to the election of several black Republicans who have been elected to judicial office in districts that have included the Town. Other blacks have been elected to office in districts comprised of segments of the Town. As to those elections, we agree with the proposition that "exogenous elections--those not involving the particular office at issue--are less probative than elections involving the specific office that is the subject of the litigation." Clark v. Calhoun County, Miss., 88 F.3d 1393, 1397 (5th Cir.1996). Moreover, with respect to the election of two black Republicans to judicial office in District No. 2 of the Nassau County District Court, consisting of the Town and the City of Long Beach, it appears that one of those candidates was not black-preferred, and the record does not indicate whether the second candidate was preferred. The two blacks elected as Justice of the New York State Supreme Court in the Tenth Judicial District, including all of Nassau and Suffolk Counties, were nominated by a convention of delegates selected from the entire Judicial District.
 
 
 84
 With respect to the election of blacks to the Office of Member of Assembly in the 18th Assembly District, Mayor of the Village of Hempstead, Trustee and Deputy Mayor of the Village of Hempstead and Representatives to the Nassau County Legislature, the segments of the Town from which these black-preferred officeholders were elected have a predominantly black population. This fact cuts in favor of the relief afforded by the district court--the division of the Town into single-member election districts with one minority-majority district.
 
 
 85
 Reverting to the elements of a Voting Rights Act violation set forth at the beginning of this Discussion, and applying them to the proof in this case, it can be seen that (1) the at-large voting practice (2) imposed by the Town of Hempstead (3) operates in a manner that abridges the rights of blacks to vote (4) on account of race. The totality of the circumstances demonstrates that (1) the political processes for nomination and election in the Town of Hempstead (2) are not equally open to participation by members of the protected class (3) because the class members, owing to exclusion from the Republican slating process and the historical primacy of the Republican Party in Town government, have less opportunity than others (whites) to participate and elect representatives of their choice. The subsidiary factual findings made by the district court fully support its ultimate finding on the question of vote dilution. Because we have no basis upon which to conclude that the ultimate finding is clearly erroneous, we cannot disturb it. See City of Niagara Falls, 65 F.3d at 1008. Finally, we agree with the district court's rejection of the Town's partisan politics argument:
 
 
 86
 In evaluating all of the relevant facts as a whole, including the size of the Town, the absence of geographic subdistricts, the lack of access by blacks to the Republican Party slating process, the unfortunate use of racial appeals in political campaigns, the lack of responsiveness by the Town Board to the particularized needs of the black communities, and the stated desire by the Town government to cling to a monolithic, single-voice legislature for a heterogeneous population consisting of many difference communities and voices, I conclude that black citizens' failure to elect representatives of their choice to the Town Board is not best explained by partisan politics.
 
 
 87
 Goosby I, 956 F.Supp. at 355.
 
 
 88
 In formulating a remedy, the district court rejected the Town's favored plan--a two-district system with one single-member district encompassing one-sixth of the Town's population and a majority of the Town's black population, and a second five-member district for the other five-sixths of the population. See Goosby II, 981 F.Supp. at 754. This course was properly rejected by the trial court, since race was the predominant factor motivating the plan. Where a jurisdiction's plan is motivated by race, strict scrutiny applies, and the plan is unconstitutional unless its challenged features are narrowly tailored to serve a compelling state interest. See Bush v. Vera, 517 U.S. 952, 962, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996). The Town's plan for a two-district division does not meet the test. The district court found that
 
 
 89
 [t]he segregation effected by the Town Board's two-district plan is almost total. Ninety-seven percent of the black voters in the Town of Hempstead are placed in District 1, which has an overall population that is over 58% black. By contrast, District 2, (i.e., the balance of the Town) is over 97% non-black.
 
 
 90
 Goosby II, 981 F.Supp. at 759 n. 7. The court found that the sole motivating factor for the two-district political division was race. While holding that remedying a Voting Rights Act violation is a compelling state interest, the court concluded that the proposed plan was violative of the Fourteenth Amendment. See id. at 761. We agree that the two-district plan is so unusual and bizarre that it clearly cannot fulfill the "narrowly tailored" requirement.
 
 
 91
 Although the district court found that race was the sole factor motivating the two-district plan, it also found that race played a role, but was not the predominant factor, in the six-district plan. The latter plan was found to be in accordance with traditional districting principles and that race consciousness was a subordinate factor. See id. at 762. We agree with the district court that, even if the six-district plan required strict scrutiny, it is in any event narrowly tailored to the goal of remedying the vote dilution found here. It includes six reasonably compact districts that are normal in shape and approximately equal in size of population. It respects local community boundaries, and racial considerations were addressed only insofar as necessary to remedy the violation. We think that the six-district plan is an entirely appropriate remedy under the circumstances.
 
 CONCLUSION
 
 92
 We affirm the judgment of the district court in all respects, including that portion of its order that provides for the district court to establish a schedule for a special election in accordance with the foregoing.
 
 LEVAL, Circuit Judge, concurring:
 
 93
 I also vote to affirm the judgment of the district court, but for slightly different reasons.
 
 
 94
 The Town contends that some racial motivation is necessary to show a violation of section 2 of the Voting Rights Act. It asserts that plaintiffs failed to show any such motivation because black voters' lack of success in electing candidates of their choice is attributable solely to political preferences: The Town historically has been and remains overwhelmingly Republican, while black voters have tended to vote for Democrats who have lost. Plaintiffs and their amici contend that section 2 does not require racial motivation. They further contend that, if racial motivation is needed, the need is satisfied: Although the at-large district was not created to achieve race-based goals, it effectively combines with racial animus to deprive black voters of equal participation in the political process.
 
 
 95
 As enacted in 1965, section 2 prohibited a voting mechanism "imposed or applied by any State or political subdivision to deny or abridge the right of any citizen ... to vote on account of race or color." Voting Rights Act of 1965, 79 Stat. 437 (current version at 42 U.S.C. § 1973). In 1980, a plurality of the Supreme Court interpreted that text to go no further than the Fifteenth Amendment, and to prohibit only electoral mechanisms intentionally adopted or maintained by state officials for a racially discriminatory purpose. See City of Mobile v. Bolden, 446 U.S. 55, 61, 65 (1980) (plurality opinion). In 1982 Congress amended the act, apparently to reject the Bolden interpretation. See Thornburgh v. Gingles, 478 U.S. 30, 35, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). While making clear that the statute no longer requires discriminatory intent by a state actor, the amendment clarified little more. It is exceedingly difficult to discern what the amended statute means.[1]
 
 
 96
 Subsection (a) of the amended statute retains the original statute with one significant change. Where the original act had addressed voting mechanisms "imposed or applied to deny or abridge the right ... to vote on account of race or color," the new version reaches mechanisms "imposed or applied ... in a manner which results in a denial or abridgement of the right ... to vote on account of race or color." This substitution clearly diminishes the importance of motivation and focuses more on result. Retention of the words "on account of race or color," however, suggests a continuing concern for race-based motivation, at least within the electorate.[2] (I recognize that courts have sometimes construed similar language not to require proof of race-based intent. See Griggs v. Duke Power Co., 401 U.S. 424, 432, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) (construing section 703(a)(2) of Title VII, 42 U.S.C. § 2000e-2(a)(2)--which prohibits adverse employment actions "because of" an individual's race--to reach job requirements that unnecessarily have a "disparate impact" on a minority group).)
 
 
 97
 The 1982 amendment also added a new subsection (b). The first sentence of subsection (b) asserts that a violation of subsection (a) is established "if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election ... are not equally open to participation by [the class of persons] protected by subsection (a) ... in that its members have less opportunity than [others] to participate in the political process and to elect representatives of their choice." Under this structure, a showing that satisfies subsection (b) is deemed to satisfy subsection (a). Subsection (b) is satisfied by a showing "the political processes leading to nomination or election are not equally open" to persons of a race or color "in that [they] have less opportunity than [others] to participate in the political process and to elect representatives of their choice."
 
 
 98
 This standard is exceptionally vague. One has almost no guidance as to what illegally lessens the opportunity to vote. Following the Senate Report, the Supreme Court has directed courts to consider multiple factors, in "the totality of the circumstances," in determining whether section 2 has been violated. See Johnson v. DeGrandy, 512 U.S. 997, 1010 & n. 9, 114 S.Ct. 2647, 129 L.Ed.2d 775 (1994) (quoting Gingles, 478 U.S. at 44-45 (citing S.Rep. No. 417, 97th Cong., at 28-29, reprinted in 1982 U.S.C.C.A.N. 177, 205-06)). The specified factors, however, give little guidance as to what constitutes a violation of the act.
 
 
 99
 The last sentence of subsection (b) and its proviso add further confusion, particularly where, as here, plaintiffs' claim is based largely on their lack of success in electing their preferred candidates. The sentence states that "the extent to which members of a protected class have been elected ... is one circumstance which may be considered." The proviso goes on to say, however, that the statute confers no "right to have members of a protected class elected in numbers equal to their proportion in the population."
 
 
 100
 Probably the result of a political impasse in Congress, these provisions are especially confusing. They might be read to state two forceful propositions that point in opposite directions and thus cancel each other out: First, minority voters' failure to elect representatives in proportion to their population can be highly significant in establishing a violation--but second, there is no right to achieve proportional success. Alternatively, the provisions may simply state self-evident propositions. The main clause says that the success or failure of minority candidates "may be considered" in deciding whether members of that minority have had "less opportunity [than others] ... to participate in the political process and to elect representatives of their choice." The proviso, meanwhile, might merely state one of two reasonably obvious propositions: that the requirements of the statute do not go so far as to guarantee strict proportionality of representation, or that the failure of members of a protected class to elect candidates of their class may result from voters of that class voting for candidates who are not of that class, so that the election of few members of a minority might say little about the overall opportunity of class members to participate. See NAACP v. City of Niagara Falls, 65 F.3d 1002, 1015 (2d Cir.1995). The last sentence and proviso therefore either cancel each other out or assert nothing of significance.
 
 
 101
 The relevance of race-based intent to a violation of subsection (b) is especially unclear under the amended act. To satisfy subsection (b), a plaintiff must show that persons of plaintiff's class "have less opportunity than others to participate in and elect representatives of their choice." In some instances, such lesser opportunity clearly could result from procedures imposed without racial motivation. An easy case of a violation might occur where established polling places are geographically inaccessible to a new settlement of voters in a protected class. Cf. Perkins v. Matthews, 400 U.S. 379, 387-88, 91 S.Ct. 431, 27 L.Ed.2d 476 (1971). On the other hand, in other circumstances, the lessening of a protected class's opportunity might result solely from race-based animus. For example, even when members of a protected class have an equal opportunity to cast ballots, race-motivated actions by nominating committees or majority voters might lessen the opportunity for members of the minority to elect their choice of representatives. See White v. Regester, 412 U.S. 755, 766-69, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973). It thus appears that some violations of subsection (b) might require race-based intent on the part of officials or voters, but others would not.
 
 
 102
 The Supreme Court has offered no definitive guidance on the role of discriminatory intent under section 2. In Gingles, four Justices understood section 2 to require no showing of racial intent. See 486 U.S. at 61-74 (plurality opinion). But five Justices expressed different views. See id. at 83 (White, J., concurring); id. at 100-01 (O'Connor, J., concurring). Subsequent decisions have not clarified the issue.
 
 
 103
 Section 2 has been aptly described as a "compromise that seeks to have things both ways." Baird v. Consolidated City of Indianapolis, 976 F.2d 357, 359 (7th Cir.1992). Interpreting such a statute is a particular challenge. One approach to statutory interpretation tells judges to rely only on the text and a dictionary. However valuable that approach may be when statutes contain decipherable instructions as to a particular question, the approach is of no use when a statute contains no such guidance. In some instances, either because Congress was internally divided or because it lacked a clear idea how a general principle should play out in the specifics, a statute simply leaves the major questions unanswered. In those cases, a special relationship arises between Congress and the courts. Having left open the inevitable questions, Congress enters a partnership with the courts, assigning them the task of supplying answers based on common sense and good judgment in giving effect to the incompletely formulated intentions and apparent compromises of the statute. The Sherman Act is one vague statute whose general terms require courts to play an especially active interpretive role. See 15 U.S.C. § 1 (1999) ("Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal."). Even more than in the Sherman Act, which at least contains a clear general message, in the Voting Rights Act Congress has assigned the courts such a partnership role.
 
 
 104
 On the issue of intent, Justice Brennan's plurality opinion argued that the statute intended to reject any requirement of racial animus. See Gingles, 486 U.S. at 61-74. The opinion pointed to observations in the Senate Report of two significant disadvantages to such a requirement: first, that attempts to prove racial animus in litigation would likely have a divisive effect; and second, that racial animus is often difficult to prove, so that such a requirement might allow some violations to escape redress. See id. at 71-73.
 
 
 105
 While these observations are surely accurate, there are important countervailing considerations. Difficulty proving racial animus in some circumstances may result from the fact that there was none. For courts to find violations and invalidate elections and election procedures in the absence of any racial motivation, merely because a protected class can show it has had little success electing candidates, could produce enormous disruptions in the political process.[3] As the majority report indicates, this was not Congress's intent. See S.Rep. No. 417, at 35, reprinted in 1982 U.S.C.C.A.N. at 213 (stating that the act "will not result in wholesale invalidation of electoral structures").
 
 
 106
 In my view, the more deeply judicial intervention would intrude into the political process, the more reluctant courts should be to find a violation without a finding of racial motivation. For example, in a circumstance discussed above, the act might require the establishment of a polling place near a new concentration of protected class members, even though the location of polling places had not been racially motivated, if the inaccessibility of the polling place lessened the opportunity of class members to cast ballots. Such a remedy involves little judicial intrusion into the political process. On the other hand, where the complaint essentially alleges that voters of the protected class have had little success electing candidates of their choice, and where correction would require radical political restructuring-either by redrawing district lines or by changing the nature of representation from at-large to single-representative districts-I believe courts should not find a violation in the absence of race-based intent. See S.Rep. No. 417, at 21, reprinted in 1982 U.S.C.C.A.N. at 198 (citing with approval the holding of Whitcomb v. Chavis, 403 U.S. 124, 153, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971), that absent "built-in bias" against blacks, the "cancell[ing] out" of black votes constitutes a "mere euphemism for political defeat at the polls," not a Voting Rights Act violation).[4] I therefore reject the plaintiffs' argument that Hempstead's long-standing multimember district at-large can violate the plaintiffs' rights under section 2 absent race-based intent on the part of either Hempstead's officials or its voters.
 
 
 107
 The next question is how a court should analyze race-based intent. In my view the concerns discussed by Justice Brennan's Gingles opinion can be appropriately accommodated, without excessive judicial intrusion into the electoral process, by burden-shifting. In order to establish a prima facie case of vote dilution, plaintiffs must prove the three "necessary preconditions" to a section two violation under Gingles: that the minority group is large and compact enough to constitute a majority in a single-member district; that the minority is politically cohesive; and that the majority ordinarily votes sufficiently as a bloc to defeat the minority preferred candidate. See Gingles, 478 U.S. at 50. Proof of those three factors sufficiently supports an inference that race may have been a motivating factor to justify imposing on defendants the burden to prove that the regular defeat of minority preferred candidates is not the result of race-based intent on the part of the governing officials of the electorate. Cf. Vecinos de Barrio Uno v. City of Holyoke, 72 F.3d 973, 983 (1st Cir.1995). On this issue, a defendant can ultimately prevail by showing, in the "totality of the circumstances," Johnson, 512 U.S. at 1011, that the lessening of plaintiffs' opportunity to elect their preferred candidate did not result from race-based intentions.
 
 
 108
 Although the district court proceeded on a different understanding of section 2, the court's judgment must be affirmed under these standards. The court found that the three Gingles preconditions were satisfied: The black minority in Hempstead is large and compact enough to form a majority in a single-member district; the minority is politically cohesive, as it is heavily Democratic; and the white majority, which is heavily Republican, has always voted as a bloc that defeats the minority's preferred candidates in Board elections. Those findings are supported by the evidence, and they placed the burden of proving that race was not a motivating factor upon the defendants.
 
 
 109
 Based on the district court's factual findings, none of which is clearly erroneous, I cannot say that defendants carried their burden of disproving racial motivation. Judge Gleeson made a number of findings indicating that race is a factor in the politics of Hempstead. Racial appeals have been features of Town elections on more than one occasion. Town law enforcement officers have engaged in race-conscious policing--essentially telling black youths visiting from Queens to "go back where they belong." Agencies of the Town government have committed acts of racial discrimination to which the Town has made no response. And the Town has a history of indifference to the economic and social needs of the black communities within Hempstead, even though they have lower incomes than the rest of the Town.
 
 
 110
 It is true that blacks were sometimes elected in Hempstead, but they were elected to positions other than the Town Board, from geographical areas other than the Town proper. This is not enough to establish that race was not a motivating factor in elections for the Town Board, especially in the "comprehensive, not limited, canvassing of relevant facts" that the act requires. Johnson, 512 U.S. at 1011. Until this litigation began, the Republican Party in Hempstead had never recruited an African-American candidate for the Town Board--a fact that distinguishes both LULAC, 999 F.2d at 861, and Baird, 976 F.2d at 361. Furthermore, a majority of white voters in Hempstead had never supported a black candidate for the Board--another difference from LULAC, 999 F.2d at 861. After this litigation began, the Republican Party did choose a black candidate, but he was not supported by the majority of blacks active in the Republican Party. His selection hardly eases fears, engendered by the history, that black voters in Hempstead have less political influence than similarly situated white voters. See Solomon v. Liberty County Comm'rs, 166 F.3d 1135, 1143 (11th Cir.1999).
 
 
 111
 In the totality of the circumstances, the defendants failed to show that racial motivation was not a cause of blacks' persistent defeat at the polls. As Judge Gleeson noted, it appears that in Hempstead, "race-neutral factors, such as political partisanship ... co-exist with race-based ones, such as diminished access to the slating process or insensitivity by elected officials to the particularized needs of the minority community." Under section 2, it is necessary to find only that (1) the complete failure of blacks to elect the candidates of their choice to the Town Board, despite their electoral cohesiveness and strength, satisfied the plaintiffs' burden on the first three elements of a violation through vote dilution, and (2) defendants' evidence failed to demonstrate the absence of race-based intentions as a contributing cause. I believe plaintiffs proved a section 2 violation.
 
 
 
 [1]
 The individual defendants-appellants as well as the Town Board are referred to collectively throughout this opinion as the "Town Board" or the "Board"
 
 
 [2]
 The district court also certified a subclass of "[a]ll present and/or potentially eligible Puerto Rican voters and other voters of Hispanic descent residing in the Town of Hempstead." The representatives of this class voluntary withdrew as plaintiffs-representatives after all parties agreed that the Hispanic population was not statistically significant. See Goosby v. Town Bd. of the Town of Hempstead, 956 F.Supp. 326, 328 n. 1 (E.D.N.Y.1997)
 
 
 [3]
 The court also denied the plaintiffs' motion to enjoin the Town Board election to be held on November 7, 1997 under the at-large system, noting that allowing the election would cause no irreparable injury to the plaintiffs because the Town could convene a special election if this Court affirmed the district court's ruling. See Goosby II, 981 F.Supp. at 763
 
 
 [4]
 According to the 1990 census, Alaska, Delaware, North Dakota, South Dakota, Vermont and Wyoming had smaller populations than the Town. See Information Please Almanac 749-82 (Otto Johnson ed.1997). The cities of New York, Los Angeles, Chicago, Houston, Philadelphia, San Diego, Phoenix, Dallas, San Antonio, Detroit, San Jose, Indianapolis and Baltimore were the only United States cities with larger populations than the Town. See id. at 812
 
 
 [5]
 The number of Town Board members was increased from four to six by referendum in 1967. The Town Supervisor has an ex officio seat on the Town Board and is the Town's chief operating officer and administrator. Like the Board members, the Town Supervisor is elected at-large and serves a two-year term. The plaintiff class did not challenge the at-large method of electing a Town Supervisor
 
 
 [6]
 Executive leaders nominate candidates for county chairman, and the committee members then elect a chairman. At the time of trial, there were at least 20 vice-chairmen of the Nassau County Republican Party. The first vice-chairman assumes the duties of the chairman on an interim basis if the chairman is unable to fulfill his duties. The chairman appoints the other vice-chairmen, who typically are people who have been active politically but have not been elected as executive leaders
 
 
 [7]
 Over the years, the Town Board has also appointed a number of black Republicans to various Town government posts. For example, William Phears was named as Commissioner of the Department of Water, Robert Francis as Commissioner of the Department of Economic Development, Sinita Walker as a member of the Board of Zoning Appeals and subsequently as Commissioner of the Department of Elections. Additionally, Clinton Boone was named as Commissioner of the Department of Occupational Resources, Peter LeMonier as Deputy Commissioner of the Department of Parks and Recreation, Jay Jackson as General Counsel to the Department of Planning and Economic Development, Henry Holly as a member of the industrial development agency and planning board, and Briding Newell as head of the Town agency that addresses drug and alcohol issues
 
 
 [8]
 As noted, in the 1993 election of Curtis Fisher, the difference between his support among white voters and his support among black voters was 19.7%--i.e., he received 49.2% of the white vote and 29.5% of the black vote
 
 
 [9]
 Section 1973b(f)(2), the provision referred to in § 1973, provides that "[n]o voting qualification or prerequisite to voting ... shall be imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote because he is a member of a language minority group."
 
 
 [1]
 The act now reads:
 (A) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color ..., as provided in subsection (b) of this section.
 (B) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to the participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.
 42 U.S.C. § 1973.
 
 
 [2]
 Some courts find that a requirement of racial animus survives the 1982 amendment, and can be satisfied by racial motivation on the part of the electorate, rather than the state. See, e.g., Nipper v. Smith, 39 F.3d 1494, 1524-25 (11th Cir.1994) (en banc) (opinion of Tjoflat, C.J.); LULAC v. Clements, 999 F.2d 831, 859-63 (5th Cir.1993) (en banc)
 
 
 [3]
 Consider, for example, a case in which a district line was set long ago and has since been maintained without any racial motivation. In recent years, a cluster of members of a protected class develops around the dividing line, with a substantial percentage of the cluster falling on both sides of the line. If the members of that class could not elect their preferred representative in the districts on either side of the line, but could elect a representative if the line were shifted so that the entire community fell into one district, then plaintiffs from that class could argue that the maintenance of the line deprived them of the opportunity to elect a representative of their choice. In such a circumstance, the notion that courts could invalidate an election and require revision of election districts, without any showing of discriminatory intent, seems to me alarming and far beyond the probable contemplation of Congress
 
 
 [4]
 In deciding whether or not discriminatory intent is necessary to a section 2 violation, another factor that may be relevant is whether the alleged violation appears more concerned with process or outcomes. The accessible location of polling places, for example, is necessary to a fair process in which all persons can cast a vote. The law may plausibly guarantee a fair process regardless whether the unfairness to be remedied is the product of discriminatory intent. But where plaintiffs allege that they are unable to elect representatives of their choice, their complaint, at least on its face, is that the outcome is unfavorable to them. Ordinarily, American law guarantees equal electoral opportunity, not equal electoral results. See Davis v. Bandemer, 478 U.S. 109, 131-33, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986); Baird, 976 F.2d at 359. If courts are to police electoral outcomes, it is reasonable that they first require that discrimination, within the electorate if not the state, have infected the election. When discrimination is present, it can be said that the process also was not fair, in the sense that it was marred by illegitimate animus. For this reason, when a complaint appears to allege only bad outcomes, it makes sense to require discriminatory intent
 Requiring discriminatory intent to prove vote dilution reduces the otherwise serious tension between section 2 and constitutional principles. Prohibiting the electoral process from effectuating discriminatory animus is entirely consistent with the nation's commitment " 'to confront its conscience and fulfill the guarantee of the Constitution' with respect to equality in voting." Bush v. Vera, 517 U.S. 952, 992, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996) (O'Connor, J., concurring) (quoting S.Rep. No. 417, at 4, reprinted in 1982 U.S.C.C.A.N. at 181). However, entitling a unified racial minority to elect a representative of its choice, even when the minority's electoral defeats have nothing to do with racial animus, creates an inappropriate inducement to vote according to race rather than ideas. If the Voting Rights Act is read to create a remedy where there is no proof in a particular case that past or present discrimination causes bloc voting, then the act arguably "threatens to carry us further from the goal of a political system in which race no longer matters--a goal that the Fourteenth and Fifteenth Amendments embody, and to which the Nation continues to aspire." Shaw v. Reno, 509 U.S. 630, 657, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993).